Paul A. STERN, et al.

v.

TARRANT COUNTY HOSPITAL DISTRICT, et al.

Civ. A. No. 4–80–281–E.

United States District Court, N.D. Texas, Fort Worth Division.

June 6, 1983.

---

**107.** *United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n,* 228 F.Supp. 483, 489–90 (S.D.N.Y.1964).

James A. Williams, Bailey, Williams, Westfall, Lee & Fowler, Dallas, Tex., for plaintiffs.

Frederick M. Schattman, Asst. Dist. Atty., Tarrant County, Fort Worth, Tex., for defendants.

Alan Wilson, Law, Snakard, Brown & Gambill, Fort Worth, Tex., for George J. Luibel.

## MEMORANDUM OPINION AND ORDER

MAHON, District Judge.

Plaintiffs Paul A. Stern, Lee J. Walker, C. Raymond Olson, Joel Alter and W.R. Jenkins bring this action against Defendants Tarrant County Hospital District, John Peter Smith Hospital, Harold B. Daley, Bruce K. Jacobson, George J. Luibel, Robert L. McAfee, George H. Moore, Harry A. Noah, Tim Philpot, James C. Pollard, and Julius Truelson, alleging that the denial of Plaintiffs' applications for staff membership at John Peter Smith Hospital has denied to these plaintiffs their rights and privileges under the Fifth and Fourteenth Amendments to the Constitution of the United States pursuant to 42 U.S.C. § 1983, and has violated the antitrust laws found in the Sherman and Clayton Acts. 15 U.S.C. §§ 1–7, and 15 U.S.C. §§ 12–27. Trial was to the Court without a jury. Having carefully considered the evidence presented, the argument of counsel and the supporting briefs, the Court enters the following opinion which will address: (1) Plaintiffs' Constitutional Rights, (2) Applicable Standard, (3) Case Law Background, (4) Abstention, (5) Texas Medical Practice Act, (6) Reasonableness, (7) Findings of Fact, and (8) Conclusions of Law.

### I. Plaintiffs' Constitutional Rights

All of the plaintiffs are physicians duly licensed by the Board of Medical Examiners of the State of Texas and all have had two or more years of post-doctoral training in a program accredited by the American Osteopathic Association. Defendants correctly assert that in order to sustain a suit under 42 U.S.C. § 1983, a plaintiff must show the Court some right, privilege, or immunity that he claims under the Constitution. Defendants are also correct in stating that a physician has no constitutional right to the staff privileges of a hospital merely because he is licensed to practice medicine. *Hayman v. City of Galveston, et al.,* 273 U.S. 414, 416–17, 47 S.Ct. 363, 364, 71 L.Ed. 714 (1927); *Daly v. Sprague,* 675 F.2d 716, 727 (5th Cir.1982); *Sosa v. Board of Managers of Val Verde Memorial Hospital,* 437 F.2d 173, 175 (5th Cir.1971).

However, that does not end the Court's inquiry. The Fourteenth Amendment contains an "equal protection" clause that applies to any "state action" regardless of whether the state action affects specific rights which themselves rise to a constitutional level. For example, in *Meredith v.*

*Allen County War Memorial Hospital Com'n,* 397 F.2d 33 (6th Cir.1968), involving the denial of reappointment of a physician to the hospital medical staff, the Court stated:

Defendants are correct in asserting that plaintiff has no constitutional right to practice his profession at a public facility ... The constitutional requirements of due process and equal protection, however, place limitations on the manner in which one can be excluded from such practice.

*Meredith* at 35.

Likewise, in a case brought by Chiropractors, the Fifth Circuit noted:

We are not called on at this time to say whether chiropractors should be admitted to practice in Louisiana, but the question is whether they are entitled to an opportunity to prove that the State's denial of their claimed right to practice an allegedly useful profession is so arbitrary and unreasonable as to amount to a denial of due process or of the equal protection of the laws under the Fourteenth Amendment.

*England v. Louisiana State Board of Medical Examiners,* 259 F.2d 626, 627 (5th Cir. 1958).

Similarly, in *Foster v. Mobile County Hospital Board,* 398 F.2d 227 (5th Cir.1968), the Fifth Circuit considered the denial of admission of plaintiffs to the medical staff of the county hospital and noted:

It is not disputed by appellees that the Mobile County Hospital Board, which was created by Act No. 46 of the Alabama Legislature, and which receives both state and federal funds, is a public institution. Its acts, therefore, are state acts subject to the provisions of the Fourteenth Amendment ....

That such state action demands equal treatment of members of the same class (i.e. physicians) is a fundamental requisite of equal protection rights.

*Foster* at 230.

There are numerous cases in which the absence of a constitutional right to practice medicine in a public hospital has not prevented the courts from considering the physician's equal protection claims. Plaintiffs in this case have presented a similar equal protection claim which this Court will consider.

## II. *Applicable Standard*

In its consideration of Plaintiff's equal protection claims, the Court must determine the appropriate standard to apply. The Fifth Circuit has stated:

The proper degree of judicial "scrutiny," ... is a function of two variables: first the nature of the right affected; and second, the identity of the plaintiff. If the classification "interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class," ... "strict" judicial scrutiny is then the standard of review ... Otherwise, the question is whether the classification bears "a rational relation to a legitimate state interest."

*Pappanastos v. Board of Trustees, Etc.,* 615 F.2d 219, 220–21 (5th Cir.1980).

■ Plaintiffs have not shown a "fundamental right" nor have they shown they are a "suspect class," and, thus, the Court will use the "rational relation" standard to judge the classification in this case.

■ The rational relation standard requires an examination of whether "any state of facts reasonably may be conceived to justify" the challenged classification. *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). The Fifth Circuit, in *Foster,* after noting that the actions of a county hospital board are state actions demanding equal treatment of all members of the same class (of physicians) explained that "[a]ny distinction between such members must be on a reasonable basis" and "the distinctions which are drawn must in some way relate to the purpose of the classification made." *Foster* at 230.

These are the guidelines the Court will follow in this case.

### III. Case Law Background

An examination of the case law regarding osteopaths and their admission to practice in public and private hospitals must begin with *Hayman v. City of Galveston,* 273 U.S. 414, 47 S.Ct. 363, 71 L.Ed. 714 (1927) in which an osteopathic physician who was a resident of Texas brought suit to enjoin the enforcement of a regulation excluding osteopaths from practicing in a municipal hospital. The Supreme Court first held that a physician does not have a constitutional right to practice his profession in a hospital maintained by a state or a political subdivision (as already noted above). *Hayman* at 416–17, 47 S.Ct. at 364.

Next, the Supreme Court noted that there were "numerous systems or methods of treating diseases authorized to practice in Texas" and that in the management of a hospital, a choice among those methods of treatment would be inevitable. *Hayman* at 417, 47 S.Ct. at 364. The choice of excluding osteopaths was found to have a "basis in the exercise of the judgment of the state board," and thus, the Supreme Court stated it could not say that the regulation was either unreasonable or arbitrary. *Hayman* at 417, 47 S.Ct. at 364. Finally, the Supreme Court said that the provision of the Texas Constitution declaring that "no preference shall ever be given by law to any schools of medicine," Art. XVI, § 31, Texas Constitution, applied only to the admission to practice medicine in Texas and had nothing to do with the qualifications of those who were to be allowed to practice in state hospitals. *Hayman* at 418, 47 S.Ct. at 364.

At first glance, this case decided in 1927, would appear to definitively resolve all of the issues which are now before the Court over 50 years later. This Court, however, must always be mindful of the basic premise that our system of law is an *evolving* one, uniquely adaptable to the constantly evolving society and changing world in which we live. Therefore, the Court is compelled to examine all of the evidence presented in this case to determine if such a standard is unreasonable or arbitrary under the facts as they exist today, even though such a standard may have been reasonable under the facts as they existed over 50 years ago.

This Court, in its examination of the evidence has concluded that at least two basic changes regarding the practice of osteopathic medicine in Texas have taken place since *Hayman* was decided in 1927. First, the evidence before the Court shows that the obvious differences which once distinguished osteopathic physicians (D.O.'s) from allopathic physicians (M.D.'s) have virtually disappeared today.

It is undisputed that today there is no substantial difference between accredited medical schools conferring "Doctor of Medicine" degrees and "Doctor of Osteopathy" degrees except that students attending the medical school conferring the "Doctor of Osteopathy" degree are required to take several courses in manipulative therapy. The only remaining difference between D.O.'s and M.D.'s has been described simply as one of philosophy.

Second, the Texas Medical Practice Act, Tex.Rev.Civ.Stat. art. 4495b (Vernon Supp. 1982–83) [hereinafter called "the Act"] was passed by the Texas Legislature in 1981. This Act states, among other things, that "state agencies or political subdivisions shall not differentiate solely on the basis of the academic medical degree held by a person licensed under this Act." Subchapter A, Sec. 1.02(9) (Vernon Supp.1982–83). Such an act passed by the legislature would, at the least, require a reconsideration by the Court of the "reasonableness" of actions by a public hospital differentiating between osteopathic and allopathic physicians, even though such actions have been held to be "reasonable" in cases considered *before* the Act was passed. *See e.g., Berman v. Florida Medical Center, Inc.,* 600 F.2d 466 (5th Cir.1979).[1]

---

1. The Court notes that the *Berman* case involved a private hospital, and was dismissed on the pleadings for want of state action. Any other statements in the opinion regarding reasonableness of the osteopathic/allopathic distinction are dicta.

■ Defendants assert, however, that this lawsuit, filed in 1980, involves only events and conditions existing in 1979, and that none of these actions should be judged by an act passed in 1981. The Court does not agree. This suit was brought seeking only an injunction and does not request any relief in the form of damages for actions that have taken place in the past. Also, as the Supreme Court stated in *Bradley v. Richmond School District,* 416 U.S. 696, 717, 94 S.Ct. 2006, 2019, 40 L.Ed.2d 476 (1974): "A court is to apply the law in effect at the time it renders the decision, unless doing so would result in manifest injustice or there is statutory or legislative history to the contrary."

In determining whether an injunction should issue, the Court must examine the evidence presented to it during the trial concerning the law and facts as they presently exist. For example, if an injunction were sought and the reason for such injunction disappeared before the time of trial, the Court should not limit its inquiry to the law and facts which existed prior to the filing of the suit, but should consider the then-existing circumstances to make its decision, properly denying the injunction. Likewise, if, in the present case, the law has changed since the filing of the suit, and if such change, in addition to other evidence before the Court, would lead to the conclusion that an injunction should issue, the Court sees no reason to limit its consideration to the law and facts of 1979.

### IV. *Abstention*

Next, Defendants cite the abstention doctrine of *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). In that case a regulation issued by the Texas Railroad Commission was being attacked as unconstitutional and the Commission asserted its power under a Texas statute to issue such a regulation. There, the Supreme Court held that the district court should have abstained from hearing the case until the state courts had construed that state statute as to whether it sustained the Commission's assertion of power. The Court noted that one possible construction of the state statute would have avoided both the need for a constitutional decision and the "needless friction with state policies." *Pullman* at 500, 61 S.Ct. at 645.

In contrast, Defendants in this case are not asserting their power to make such a provision as the one in question on the basis of some state statute which has yet to be construed by state courts. There is no challenge to the constitutionality of any state statute and the Judgment to be entered in this case does not present even the possibility of ruling on the constitutionality or unconstitutionality of any state statute.[2]

Furthermore, the *Pullman*-type abstention requires that "(1) there be an unsettled issue of state law; *and* (2) there must be a possibility that the state law determination will moot or present in a different posture the federal constitutional questions raised." [the Court's emphasis] *Palmer v. Jackson,* 617 F.2d 424, 428 (5th Cir.1980); *Red Bluff Drive-In, Inc. v. Vance,* 648 F.2d 1020, 1034 (5th Cir.1981), *cert. denied sub nom., Theaters West, Inc., et al. v. Holmes, et al.,* 455 U.S. 913, 102 S.Ct. 1264, 71 L.Ed.2d 453 (1982); *See generally:* C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4242 (1978). The first prerequisite of an "unsettled issue" of state law is not found in the present case, where the state statute involved is "clear and unambiguous in all material respects." *Harmon v. Forssenius,* 380 U.S. 528, 535, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965). *See also Scheinberg v. Smith,* 659 F.2d 476, 480–481 (5th Cir. 1981); *Duncan v. Polythress,* 657 F.2d 691,

---

**2.** The other types of abstention have not been asserted and this Court finds no need to apply them. There are no "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case ... at bar," *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47

L.Ed.2d 483 (1976), and thus *Burford*-type abstention is not required. *See Burford v. Sun Oil,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Also, there are no pending state criminal proceedings and thus *Younger* abstention is not appropriate. *See Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

696 (5th Cir.1981); *High Ol' Times, Inc. v. Busbee,* 621 F.2d 135, 139–141 (5th Cir. 1980).

In the present case, the pertinent part of the state statute says that the separate laws regulating the practice of medicine should be brought together under one act and goes on to state:

[R]ecognizing that state agencies and political subdivisions which own or operate hospitals, facilities, or institutions or administer programs are responsible for determining medical staff appointments or the qualifications of physicians for such programs, and further recognizing that all persons licensed under the Act have met certain basic educational requirements, been examined by the board, and passed the same qualifying examination which applies the same standards to all who desire to practice medicine, irrespective of academic medical degree, it is the intent of the legislature to prohibit differentiation solely on the basis of the academic medical degree held by a person licensed under this Act in determining such medical staff appointments or such qualifications. To this end such state agencies or political subdivisions shall not differentiate solely on the basis of the academic medical degree held by a person licensed under this Act. State agencies or political subdivisions which own or operate hospitals, facilities, or institutions shall, however, be free to adopt reasonable rules, regulations, and requirements relating to qualifications for medical staff appointments, reappointments, termination of appointments, the delineation of clinical privileges, or the curtailment of clinical privileges of those who are appointed to such medical staff or permitted to participate in educational programs so long as such rules, regulations, and requirements are determined upon a reasonable basis, such as professional and ethical qualifications of the physician, upon standards that are reasonable, applied untainted by irrelevant considerations, supported by sufficient evidence, free of arbitrariness, capriciousness, or unreasonableness and which do not differentiate solely upon the academic medical degree held by such physician. The provisions contained herein relating to the academic medical degree shall not be applicable to any medical school or college or any programs of a medical school or college.

Tex.Rev.Civ.Stat. art. 4495b, Subchapter A, Sec. 1.02(9) (Vernon Supp.1982–83).

The Court finds this language "clear and unambiguous in all material respects." *Harmon, supra,* 380 U.S. at 535, 85 S.Ct. at 1182. It clearly applies to the Tarrant County Hospital District and it clearly prohibits differentiation solely on the basis of academic medical degree held by a person. The constitutionality of this statute is not involved, and the Court is looking to this statute only as a guide in determining the alleged reasonableness of the provision at issue in the by-laws of the medical/dental staff of the county hospital.

Having found the law is clear and unambiguous, the Court need not examine the second prerequisite for *Pullman* abstention since *both* prerequisites must be present before abstention is required. In conclusion, the Court stresses that "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation District, et al. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). *See also Zwickler v. Koota,* 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); *O'Hair v. White,* 675 F.2d 680, 692 (5th Cir.1982); *High Ol' Times, supra.* This Court does not find those "exceptional circumstances" *Id.* which must be present to justify abstention. Thus, the Court concludes the abstention doctrine of *Railroad Commission of Texas v. Pullman Co.* is not applicable to this case.

## V. Texas Medical Practice Act

The Texas Medical Practice Act of 1981, (the "Act") recognizes that "all persons licensed under this Act have met certain basic educational requirements, been examined by the board, and passed the same

qualifying examination which applies the same standards to all who desire to practice medicine, irrespective of academic medical degree." Tex.Rev.Civ.Stat. art. 4495b, Subchapter A, Sec. 1.02(9) (Vernon Supp.1982–83). More specifically, Subchapter C of the Act lists the following qualifications for licensure:

(a) An applicant, to be eligible for the examination, must present satisfactory proof to the board that the applicant:

(1) is at least 21 years of age;

(2) is of good professional character;

(3) has completed 60 semester hours of college courses other than in medical school, which courses would be acceptable, at the time of completion, to The University of Texas for credit on a bachelor of arts degree or a bachelor of science degree; and

(4) is a graduate of a medical school or college that was approved by the board at the time the degree was conferred.

(b) Applications for examination must be made in writing, verified by affidavit, filed with the board on forms prescribed by the board, and accompanied by a fee as the board determines to be reasonable.

Tex.Rev.Civ.Stat. art. 4495b, Subchapter C, Sec. 3.04(a), (b) (Vernon Supp.1982–83).

The Texas Legislature gave the State Board of Medical Examiners the following power in licensing: "In addition to the requirements prescribed by this Act, the board may require applicants to comply with other requirements that the board considers appropriate and establish reasonable fees for examination." Tex.Rev.Civ.Stat. art. 4495b, Subchapter C, Sec. 3.05(b).

The Board subsequently exercised its power under that provision. As a result, the Licensure Rules of the Texas State Board of Medical Examiners, as published in the *Texas Register,* vol. 6, No. 81, October 27, 1981,[3] list six criteria for licensure qualifications.

In addition to age, "good professional character," 60 semester hours of college courses other than medical school, graduation from an approved medical school, passing a medical examination and the Texas medical jurisprudence examination, the Board requires completion of a one-year program of graduate medical training approved by the Board. Title 22 Examining Boards, Part IX. Texas State Board of Medical Examiners, Chapter 163, Licensure by Examination, § 163.1(a) Licensure Qualifications for All Applicants, vol. 6, no. 81, Oct. 27, 1981.[4]

In § 163.2 the "approved medical schools" are described as those accredited by *either* the Liaison Committee on Medical Education *or* the American Osteopathic Association. Similarly, in § 163.4 the Board states it will approve training programs which have been accredited by *either* the Liaison Committee on Graduate Medical Education *or* the American Osteopathic Association (or two other committees). Evidence was presented during the trial of this case to explain the fact that the Liaison Committee on Graduate Medical Education, although it is not an arm of the American Medical Association, accredits only allopathic medi-

**3.** The Court takes judicial notice of these Rules pursuant to Art. 6252–13a § 4(c) Tex.Rev.Civ. Stat. (Vernon Supp.1982–83).

**4.** The Court notes that House Bill No. 1999 amends the Texas Medical Practice Act to add the following subsection (5) to Chapter C regarding qualifications for licensure in Texas:

(5) has successfully completed a one year program of graduate medical training approved by the board. In addition to other licensure requirements, the board may require by rule and regulation that graduates of medical schools located outside the United States and Canada comply with other requirements that the board considers appropriate, including but not limited to additional graduate medical training in the United States, except those who qualify for licensure in Section 5.04 of this Act. However, the applicant shall be eligible for examination prior to complying with Subdivision (5) of Subsection (a) of this section but shall not be eligible for the issuance of an unrestricted license until the requirements of this subsection have been satisfied.

During the Sixty-eighth Legislature, House Bill No. 1999 passed the House on April 29, 1983, and passed the Senate on May 29, 1983, and is now pending the signature of Texas Governor Mark White.

cal programs (and has from the day of its inception).

The Act, in recognizing that all persons who have been licensed under the Act have met a threshold of requirements (that "threshold" being the six requirements of § 163.1 discussed above), states the intent of the Legislature to prohibit differentiation solely on the basis of academic medical degree. These threshold requirements accept both allopathic and osteopathic degrees and training. The Court chooses to refer to the six requirements listed in § 163.1 as "threshold" requirements because beyond this "threshold" of requirements there are, of course, further reasonable requirements for additional professional and ethical qualifications for any physician who desires to be appointed to the medical staff of a public hospital.

Obviously, the fact that a person has met these "threshold" requirements for licensing does not mean that he should automatically be appointed to the staff of a public hospital, and the Court recognizes and approves a requirement of additional standards for appointment. However, in considering staff appointments to public hospitals, there is no apparent reason to re-examine the elements of the "threshold" qualifications that every physician licensed in Texas must meet, and to differentiate between osteopaths and allopaths solely because of the degree they hold or the training they received since both of the types of degrees and training are unquestionably acceptable in the "threshold" requirements for licensure in Texas.

The Texas legislature clearly expressed its intent in this matter in the following sentence:

> State agencies or political subdivisions which own or operate hospitals, facilities, or institutions shall, however, be free to adopt reasonable rules, regulations, and requirements relating to qualifications for medical staff appointments, reappointments, termination of appointments, the delineation of clinical privileges of those who are appointed to such medical staff or permitted to participate in educational programs so long as such rules,

> regulations, and requirements are determined upon a reasonable basis, such as professional and ethical qualifications of the physician, upon standards that are reasonable, applied untainted by irrelevant considerations, supported by sufficient evidence, free of arbitrariness, arbitrariness, or unreasonableness and which do not differentiate solely upon the academic medical degree held by such physician.

Tex.Rev.Civ.Stat. art. 4495b, Subchapter A, Sec. 1.02(9) (1982).

The Court now turns to the question of whether the provision in Article 3, § 3.11 of the by-laws of the Medical/Dental Staff of John Peter Smith Hospital (Joint Exhibit 11) is, in fact, a reasonable one.

## VI. *Reasonableness*

In *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) Justice Brennan spoke for a majority of the Court in considering an equal protection challenge to a state statute:

> But States are not required to convince the courts of the correctness of their legislative judgments. Rather, 'those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.' *Vance v. Bradley,* 440 U.S. 93 [99 S.Ct. 939, 59 L.Ed.2d 171], legislation under the Equal Protection Clause may introduce evidence supporting their claim that it is irrational ... they cannot prevail so long as 'it is evidence from all the consideration presented to [the legislature] and those of which we may take judicial notice that the question is at least debatable' [cites omitted].

*Clover Leaf,* 449 U.S. at 464, 101 S.Ct. at 724.

Also, in contrast to *Clover Leaf,* Plaintiffs have challenged the *theoretical* basis for Defendants' provision. See *Clover Leaf* at 463, 101 S.Ct. at 723. While the Court will not substitute its own judgment for those who enacted the bylaws in question it will examine the reasons given by Defend-

ants for those provisions in light of the Texas Medical Practice Act of 1981.[5]

■ The Court will first examine the background of the provision in question. The earliest staff bylaws of John Peter Smith Hospital before the Court (Joint Exhibit 1) show that in 1960, one requirement for staff membership was membership in the Tarrant County Medical Society, an allopathic institution. In 1974, that was changed to a requirement of a degree of Doctor of Medicine (allopathic) from a school accredited by the Council on Medical Education of the American Medical Association and "one year of internship approved by the Council on Medical Education of the American Medical Association" (Joint Exhibit # 3, page 2, Art. III, § 3.11). The M.D. (allopathic) requirement was continued in December 1974 (Joint Exhibit # 4), 1975 (Joint Exhibit # 5), 1977 (Joint Exhibit # 6), and 1978 (Joint Exhibit # 7).

In 1979, (Joint Exhibit # 8) the M.D. requirement was changed to a requirement of two years of training in a program accredited by the Liaison Committee on Graduate Medical Education (LCGME), which accredits only allopathic training programs. The only change in that requirement in December 1980 was a reduction from two years to one year of training (in the LCGME accredited program). The record does not reveal why this was changed from two years to one year. Then, in December 1981, the accrediting body was changed from the LCGME to the "Accreditation Committee on Graduate Medical Education," a successor to the LCGME.

In the bylaws of 1979 (Joint Exhibit # 8) there was a "waiver" of the above qualifications, in "exceptional cases." It was under this waiver that Dr. Paul Stern, one of the Plaintiff osteopaths, had applied for staff membership and privileges, and the

Executive Committee did, in fact, recommend waiving that requirement for Dr. Stern on August 7, 1979. However, before the matter was presented to the Board of Managers for the Tarrant County Hospital District, Dr. Bruce Jacobson (who admitted to this Court that he wishes to keep the Hospital an allopathic institution) contacted the then Assistant Tarrant County District Attorney, Marvin Collins, who was the Board's legal advisor, and raised the question of what guidelines were to be applied in the "exceptional cases."

Mr. Collins, the legal advisor, recommended that the approval of Dr. Stern be deferred pending receipt of the staff's recommendations concerning the guidelines. The Board of Managers determined that no appropriate guidelines could be established and thus eliminated the "waiver" for exceptional cases. Dr. Stern was denied staff privileges and all other Plaintiff osteopaths were likewise denied staff privileges in 1979. Subsequently, the bylaws were amended in 1980 to eliminate any possible "waivers" under any circumstances. All parties before the Court agree the denial of staff membership for all Plaintiffs was based solely on their lack of training in an LCGME-accredited program.

Defendants first assert that such a requirement relates to the post-graduate medical training program of physicians, not to their "academic medical degree" and thus, does not "differentiate solely on the basis of the academic medical degree held by a person licensed under this Act" Vernon's Ann.Civ.St. Art. 4495b, *supra.* However, it is obvious that if the Board of Managers were to state in the bylaws that the Board, itself, rather than the LCGME would be the body who must approve certain training programs, then in light of the Medical Practice Act of 1981 the Board

---

**5.** As discussed above, this suit was filed in 1980, prior to the enactment of the Medical Practice Act of 1981. The bylaws of John Peter Smith Hospital, however, have been amended since the enactment of that Act, and still require training in a program approved by the "Accreditation Committee on Graduate Medical Education," the successor of the LCGME discussed above (See Joint Exhibit # 11). Had

the bylaws which were amended in December of 1981 been changed to drop this requirement, the request for an injunction would be moot at this time. On the other hand, the Defendants, by not changing the requirement, and by claiming such requirement is reasonable even in light of the Medical Practice Act of 1981 place the issue of reasonableness before the Court today.

would not be free to state that it would personally investigate and approve only allopathic training programs providing training for physicians the majority of whom hold allopathic degrees and would not even investigate osteopathic training programs where the overwhelming majority of physicians with osteopathic degrees train.

And yet, rather than make such a statement on its own part, the Board chose to delegate such investigation and accreditation of training programs to the LCGME, who, according to the undisputed evidence in this Court, takes just such a position as described above. The Defendants appear to be attempting in this delegation to do indirectly what they cannot, in light of the Act, do directly. The Court finds this to be unreasonable.[6]

Next, Defendants assert that even if such approval of graduate training programs is differentiation on the basis of academic medical degree, it is not *solely* on such a basis, but is also based on the reasonable desire on the part of the Board that only the physicians of the highest quality be on the staff. Noting that the burden is on the Plaintiffs to convince the Court that the reason given by Defendants "could not reasonably be conceived to be true by the . . . decisionmaker," *Clover Leaf* at 464, 101 S.Ct. at 724, the Court finds that Plaintiffs have carried their burden of proof in this case for the following reasons.

The Court is aware that concern about the high quality of physicians in John Peter Smith Hospital is a basic principle in all actions taken by that hospital. However, the history of the bylaws of the Tarrant County Hospital District and the testimony before the Court reveals that in the years since 1960 the bylaws have repeatedly been amended to meet the changing legal standards regarding osteopaths and allopaths, and at the same time, to continue to have the ultimate effect of excluding all osteopathic physicians. Thus, the Court has seen a continuous pattern, the actual purpose of which is to exclude *all* osteopathic doctors from the hospital either by requiring that they be M.D.'s or by later requiring that their post-doctoral training be allopathic. It appears that such provisions were aimed not at maintaining a highly-qualified staff, but at maintaining a segregated allopathic hospital.[7]

Second, the Court notes that even if such a concern about the qualifications of the staff is the true reason for the provisions in question, that reason has been shown by Plaintiffs to be arbitrary and capricious. Defendants' assertions that they are primarily concerned with seeing that only the physicians of highest quality are on the staff and that they must therefore carefully make such rules and regulations as are before the Court today, are weakened by several facts which they have neither denied nor contradicted. First, as the Court has discussed above, the "threshold" requirements for Licensure in Texas approve of both allopathic and osteopathic post-graduate medical training. The Medical Practice Act, while recognizing that certain *additional* factors (namely "professional and ethical qualifications" of the physician) may be considered in appointment to staffs of public hospitals, does not include the reexamination of those "threshold" requirements as a factor, implying that those who have met the threshold requirements are equally qualified in those areas. Thus, a concern about the quality of physicians would be unreasonable according to the Medical Prac-

---

**6.** Plaintiffs assert that delegating the determination of qualifications for staff membership from the Board to the LCGME is improper under *Duson v. Poage,* 318 S.W.2d 89 (Tex.Civ. App.1958 w/r n.r.e.). Without deciding that issue, the Court emphasizes that even if such delegation were proper, in the present case it would result in a party doing indirectly what he must not do directly under the law. On the other hand, if such delegation is improper, the new words added to the bylaws in 1979, and in the 1980 and 1981 bylaws stating that the stan-

dards of the accrediting body LCGME are specifically "adopted" does not cure the delegation problem.

**7.** For example, Dr. Hargrove testified that a position taken in 1976 involved keeping all osteopaths off of the staff. A fall-back position was to allow D.O.'s but make them allopathic. He admitted this fall-back position was assumed in 1979. No words about the quality or ability of the staff were involved.

tice Act, if it measured such quality by differentiating solely between allopathic and osteopathic education.

Here, the Board of Managers asserts its desire to reexamine those threshold requirements, for no apparent reason. Dr. Jacobson testifying for the Defendants admitted that he did not consider osteopathic training to be "inferior" to allopathic training. Such a statement cannot logically support the theory that a desire for the highest qualified physicians may be effected by looking only to allopathic training programs, especially in light of the Act in which a distinction between osteopaths and allopaths is unreasonable by definition.

Also, the Defendants' insistence that only those physicians who attended LCGME-approved graduate training programs have the necessary training and skills to meet the hospital's high qualifications is contradicted by the fact there are numerous physicians on the staff of John Peter Smith Hospital who attended training programs which were not approved by LCGME. LCGME came into existence in 1970, and all graduate training programs before that year fall short of this requirement. However, to avoid this small problem whenever a physician on the staff is being considered for reappointment, the bylaws were rewritten in 1980 and 1981 to read "Qualifications for *Initial* Appointment" [the Court's emphasis]. Thus an automatic waiver was written into the requirements for all allopathic physicians already on the staff in the absence of LCGME-approved training. In contrast, those osteopaths who received training before 1970 face the absolute impossibility of having attended any training program in the world that was LCGME-approved before 1970.

More importantly, in the testimony of Dr. Roberts, from Southwestern Medical School, speaking as an allopathic physician, he denied that experience at an LCGME-approved training program would mean an applicant was a good physician. He elaborated on that denial by stating that some LCGME-approved training programs are placed on probation for four to seven years. Thus some M.D.'s go through their entire residency in a deficient program, but their training looks as good on paper as any other LCGME-approved training.

A third theory offered by Defendants as a basis for the provision in question is that all physicians on the staff are "potential teachers" in the post-graduate program and Defendants have a reasonable desire that all physicians on the teaching staff at John Peter Smith Hospital should be trained in allopathic programs. In asserting this theory, Defendants apparently use a three-step process. They begin with the premise that a physician who meets the qualifications may be appointed to the hospital staff. Next, Defendants add the statement that all physicians appointed to the hospital staff are potential teachers in the post-graduate program. Finally, Defendants arrive at the conclusion that if an osteopath is appointed to the hospital staff that is the equivalent of having an osteopath on the teaching staff of the allopathic educational program. The Court considers such a conclusion a *non sequitur*. It is not supported either by the evidence before the Court or by any logical reasoning.

Defendants have explained that whenever a physician is on the hospital staff and has patients at John Peter Smith Hospital, the educational training program could potentially include his patients. Article IV, Sec. 4.8 of the bylaws of John Peter Smith Hospital states: "All categories of the Staff shall participate in the education programs of the House Staff [made up of interns, residents, and fellows] on request of the President of the Staff." Joint Exhibits 6–11. The Court notes that there is nothing "automatic" about this regulation. Only in the event that the President of the Staff takes the affirmative step of asking an osteopathic physician on the staff to participate in the education program would that potential happening actually occur. Thus the bylaws of John Peter Smith Hospital (which may be changed by Defendants at anytime) leave the decision of who will be asked to participate in education programs solely in the discretion of the President of the Staff.

Additionally, the "district sponsored patients" (those whose care is underwritten in whole or in part by the Tarrant County Hospital District) are under the sole control of the teaching staff. Thus, the argument has been presented that whenever an osteopath on the staff has a "district sponsored patient," then that patient would automatically be a patient in the education program, and that patient would somehow bring the osteopathic physician into the education program, too. The Court does not agree since the "district sponsored patient" would, according to the regulations, merely be assigned to one of the physicians on the teaching staff. *See* "Rules and Regulations of Tarrant County Hospital District Medical and Dental Staff," page 58, no. 3, Joint Exhibit # 11.

Under the same penumbra of concern about osteopaths on the hospital staff being the equivalent of osteopaths on the allopathic teaching staff, the Defendants also assert concern over losing accreditation as a graduate training program or affiliation with the University of Texas Southwestern Medical School if they appoint osteopaths to their staff. In direct conflict with that expressed concern, Defendants admit there are now four osteopathic physicians on the staff at John Peter Smith Hospital.[8] They each attended post-doctoral military service hospitals approved by the LCGME. According to Defendant's theory, every osteopathic physician on the staff is the equivalent of an osteopathic teacher in its teaching program and thus, there are already four potential osteopathic teachers on the staff of John Peter Smith Hospital.

However, the question of losing accreditation or affiliation has never arisen with regard to those four osteopathic physicians now on the staff.[9] If the possibility of an osteopath on the staff becoming a teacher were a reasonable concern, the actions of Defendants toward the four osteopaths now

on staff do not bear out that fact. The evidence before the Court simply does not support that theory.

The Court's disagreement that admission to the hospital staff would affect the affiliation with Southwestern Medical School is further strengthened by the following testimony of Mr. Philpot:

Mr. Philpot: There is a difference between medical staff application and having an affiliation for medical training. Obviously, the entrance of osteopathic physicians onto the medical staff does not directly affect the affiliation agreement. I mean, we have—

The Court: That's what I was having problems—

Mr. Philpot: We have four osteopathic physicians on the staff now, and it has absolutely no impact at all on that affiliation agreement.

You see, I categorize those two elements as separate and distinct issues altogether. I mean, a hospital can have both doctors of medicine and doctors of osteopathy. Most places I have been have. Peter Smith does, too.

Thus, the Court concludes that the third theory offered by Defendants for the requirement of post-graduate medical training in an LCGME/ACGME-approved program has been proven by Plaintiffs to be unreasonable. The Court strongly emphasizes that none of the Plaintiffs applied for the teaching staff at John Peter Smith Hospital. Thus, the Court finds that the issue of osteopaths being on the allopathic teaching staff is before the Court only because it was raised as a defense by Defendants. The Court has addressed that issue only insofar as to say that admitting osteopaths to the staff will not affect the teaching staff at John Peter Smith Hospital. The Court recognizes the two independent

---

**8.** Additionally, Dr. Hargrove testified that osteopaths do practice at other hospitals approved by the (allopathic) Joint Commission on Accreditation of Hospitals.

**9.** The Court notes that according to the testimony of Mr. Philpot, the hospital administrator, the LCGME evaluates "the interactions be-

tween the medical staff and the hospital, per se, to determine if there is an effective environment in which to train resident physicians." Apparently the presence of four osteopathic physicians on the staff has not harmed that "effective environment," since John Peter Smith still has LCGME/ACGME accreditation.

schools of medicine and the Texas legislature apparently does, too. It expressly addressed the question of differentiating between allopaths and osteopaths for a particular teaching staff in the following language:

The provisions contained herein relating to the academic medical degree shall not be applicable to any medical school or college or any programs of a medical school or college.

Tex.Rev.Civ.Stat. art. 4495b, Subchapter A, Sec. 1.02(9) (1982).

Therefore, it is obvious that this Court could not, even if it desired to (which it does not), require allopathic educational programs to include osteopathic teachers. Likewise, it could not require osteopathic educational programs to include allopathic teachers.

In conclusion, the Court finds that all of the reasons offered by Defendants for the requirement of post-graduate medical training in an LCGME/ACGME-approved program are unreasonable, and that such a requirement is a violation of Plaintiffs' constitutional rights under the Fifth and Fourteenth Amendments.

## VII. *Findings of Fact*

1. John Peter Smith Hospital is and was at all times pertinent to this litigation a public, tax-supported hospital owned and operated by the Tarrant County Hospital District, a political subdivision of the State of Texas.

2. John Peter Smith Hospital is and was at all times pertinent to this litigation managed by the Board of Managers of the Tarrant County Hospital District, which board is composed of Julius Truelson, James C. Pollard, Harry Noah, George H. Moore, Robert L. McAfee, George J. Luibel, D.O. and Harold B. Daley. The administrator of the John Peter Smith Hospital is and was at all times pertinent to this litigation Tim Philpot. The medical director of John Peter Smith Hospital is and was at all times pertinent to this litigation William O. Hargrove, M.D. The director of the family practice residency training program at John Peter Smith Hospital is and was at all times pertinent to this litigation Bruce K. Jacobson, M.D., who also was the president of the Medical/Dental Staff of John Peter Smith Hospital in 1979.

3. All the plaintiffs are physicians duly licensed by the Board of Medical Examiners of the State of Texas and all plaintiffs have had two or more years of post-doctoral training in a program accredited by the American Osteopathic Association.

4. No doctor, either allopathic or osteopathic has a constitutional right to practice medicine at a public hospital. However, all physicians have a constitutional right to equal treatment as members of the same class.

5. For several years, the bylaws of the Medical/Dental Staff of John Peter Smith Hospital specifically required that a physician admitted to practice on the staff of John Peter Smith Hospital should have an M.D. degree and at various times made other requirements which would have limited staff membership to physicians with M.D. degrees.

6. On the 28th day of February, 1979, the Board of Managers of John Peter Smith Hospital approved bylaws of the Medical/Dental Staff which abandoned the requirement of an M.D. degree but which provided that minimum requirements for admission to practice on the staff of the Hospital would be licensure by the State of Texas and two years of post-doctoral training in a program accredited by the Liaison Committee on Graduate Medical Education but provided for an exception to these minimum requirements upon the recommendation of a head of department and approval by the Executive Committee of the Medical/Dental Staff. The plaintiffs applied for privileges as members of the staff of John Peter Smith Hospital at a time when the plaintiff Stern initially was recommended by the head of the Department of Anesthesiology and approved for staff privileges by the Executive Committee of the Medical/Dental Staff. Upon presentation of that recommendation to the Board of Managers of the John Peter Smith Hospital, the attorney for the Board of Managers, an Assistant District Attorney of Tarrant

County, recommended that specific guidelines for exceptions to any of the basic requirements for staff membership be considered and the approval or disapproval of the privileges of the plaintiff Stern were held in abeyance pending review of same by the Medical/Dental Staff. The Executive Committee of the Medical/Dental Staff withdrew its recommendation for approval of staff privileges for the plaintiff Stern and those privileges were denied by the Board of Managers of John Peter Smith Hospital. All other plaintiffs' requests for privileges were denied at every level of staff and Board of Managers' level of consideration. All appellate procedural rights of the plaintiffs were pursued and at every level of appeal, the privileges were denied, it being stated, on behalf of John Peter Smith Hospital/Tarrant County Hospital District, that the sole reason for denial of privileges was the fact that the post-doctoral training of the plaintiffs was in a program which was not accredited by the Liaison Committee on Graduate Medical Education.

7. There presently exists and has existed at all times pertinent to this litigation an agreement between the Board of Managers of Tarrant County Hospital District and the Board of Regents of the University of Texas System for and on behalf of the University of Texas Southwestern Medical School at Dallas, Texas, an affiliation agreement providing for a Family Practice Residency Program established at John Peter Smith Hospital and administered by faculty of the medical school.

8. No plaintiff sought admission to the Teaching Staff of John Peter Smith Hospital.

9. There presently are on the Medical/Dental Staff of John Peter Smith Hospital, Tarrant County Hospital District, four osteopathic physicians all of whom obtained training approved by the Liaison Committee on Graduate Medical Education.

10. The Liaison Committee on Graduate Medical Education now known as the Accreditation Council for Graduate Medical Education replaced the Council on Medical Education of the American Medical Association in accrediting the post-doctoral programs of those institutions among others formerly accredited by the Council on Medical Education of the American Medical Association. The Liaison Committee on Graduate Medical Education came into existence in 1970.

11. Until recently osteopathic physicians were unable to obtain training in programs approved by the Liaison Committee on Graduate Medical Education. Today they are able to do so in various governmental programs and certain other specialized programs.

12. The 1981 session of the Texas Legislature enacted a Medical Practice Act which prohibited hospital staff membership requirements at public hospitals being based upon the medical degree held by the physician and the State Board of Medical Examiners promulgated its rules recognizing the equality of both allopathic and osteopathic accrediting agencies.

13. The requirement that the post-doctoral training of a member of the Medical/Dental Staff of John Peter Smith Hospital be approved by the Liaison Committee on Graduate Medical Education, now known as the Accreditation Council for Graduate Medical Education, effectively excludes substantially all of the osteopathic physicians who reside in and pay taxes in Tarrant County from the Medical Dental Staff of John Peter Smith Hospital and totally excludes all osteopathic physicians whose post-graduate medical training occurred prior to 1970.

14. All post-graduate medical training in osteopathic institutions, in order to be accredited, must be approved by the American Osteopathic Association. The Liaison Committee on Graduate Medical Education, now known as Accreditation Council for Graduate Medical Education, accredits programs in institutions aligned with allopathic medicine only. The two accrediting programs are substantially the same and contain no significant differences.

15. All physicians in Texas who are licensed to practice general medicine have been licensed by the State Board of Medical

Examiners whether they are osteopathic physicians (D.O.) or allopathic physicians (M.D.) and all physicians licensed to practice medicine in Texas, either osteopathic (D.O.) or allopathic (M.D.), are required to take and pass the same examination for licensure. The State Board of Medical Examiners is composed of both allopathic (M.D.) and osteopathic (D.O.) physicians.

16. Post-graduate medical training programs approved by the Board of Medical Examiners of the State of Texas for Licensure in the State of Texas are those which have been accredited by the American Osteopathic Association or the Liaison Committee on Graduate Medical Education (now known as Accreditation Council on Graduate Medical Education). The State Board of Medical Examiners recognizes accreditation of hospitals by the Joint Commission on Accreditation of Hospitals (allopathic) and the American Osteopathic Association (osteopathic). All post-graduate medical training programs approved by the American Osteopathic Association must be in institutions which are accredited by the American Osteopathic Association. All post-graduate medical training programs approved by the Liaison Committee on Graduate Medical Education (now ACGME) must be in institutions approved by the Joint Commission on Accreditation of Hospitals.

17. The Joint Commission on Accreditation of Hospitals and the Liaison Committee on Graduate Medical Education (now ACGME) primarily accredit institutions and programs aligned with allopathic (M.D.) medicine. The American Osteopathic Association approves hospitals and post-graduate medical training programs primarily aligned with osteopathic (D.O.) medicine.

18. The philosophical differences between allopathic medicine and osteopathic medicine are not sufficient to justify a differentiation between the two schools of medicine for purposes of medical staff privileges at a publicly owned and operated hospital.

19. The requirement that post-doctoral training for staff membership be accredited by the Liaison Committee on Graduate Medical Education (now known as the Accreditation Council for Graduate Medical Education) is an arbitrary and false standard and is not a standard based upon a reasonable requirement and is primarily for the purpose of basing staff membership upon the holding of an academic medical degree of Doctor of Medicine as opposed to Doctor of Osteopathy.

20. The requirement that the post-doctoral training of staff members be approved by the Liaison Committee on Graduate Medical Education is not a requirement which has as a foundation a reasonable basis such as professional and ethical qualifications for the common good of the public or the hospital itself.

21. The evidence does not establish that there was a contract, conspiracy, or combination to deny the Plaintiffs staff privileges or to unreasonably restrain trade.

22. Any finding of fact which should be a conclusion of law is hereby made a conclusion of law.

### VIII. Conclusions of Law

1. The Court has jurisdiction of this matter under 28 U.S.C. §§ 1331, 42 U.S.C. § 1983, 15 U.S.C. §§ 1–7, and 15 U.S.C. §§ 12–27.

2. Venue is proper in the Northern District of Texas, 28 U.S.C. § 1391(b).

3. 42 U.S.C. § 1983, and the Fourteenth Amendment of the Constitution of the United States do provide a basis for the injunctive relief as sought by the plaintiffs against the defendants in this case.

4. The conduct of the defendants in denying medical/dental staff privileges to the Plaintiffs on the basis of the provisions of Article 3, Section 3.11 of the Bylaws of the Medical/Dental Staff of John Peter Smith Hospital should be enjoined and the Board of Managers of John Peter Smith/Tarrant County Hospital District should be required to grant to plaintiffs the requested staff privileges.

5. The antitrust statutes of the U.S. do not provide a basis for the injunctive relief as sought by the plaintiffs against the defendants in this case.

Judgment shall be entered accordingly.