Paul A. STERN, et al.,
Plaintiffs-Appellees,

v.

TARRANT COUNTY HOSPITAL
DISTRICT, Defendant-Appellant,

v.

George J. LUIBEL, Defendant-Appellee.

No. 83–1638.

United States Court of Appeals,
Fifth Circuit.

March 18, 1985.

Opinion on Granting of Rehearing
En Banc May 7, 1985.

Clark, Chief Judge, concurred and filed an opinion.

Goldberg, Circuit Judge, dissented and filed an opinion.

Tim Curry, Crim. Dist. Atty., Frederick M. Schattman, Asst. Dist. Atty., Fort Worth, Tex., for defendant-appellant.

Bailey, Williams, Westfall, Lee & Fowler, Kevin J. Keith, Dallas, Tex., for plaintiffs-appellees P. Stern, et al.

Before CLARK, Chief Judge, GOLDBERG, and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

A Texas statute forbids state agencies to differentiate among physicians solely on the basis of their academic medical degrees.[1] Five licensed physicians, each of whom has had at least two years of post-doctoral training in a program accredited by the American Osteopathic Association, challenge the constitutionality of a requirement imposed by a state-agency hospital that, to practice in the hospital, a physician must have completed two years of post-doctoral training in a program accredited by the Accreditation Committee on Graduate

---

1. Texas Medical Practice Act, Tex.Rev.Civ.Stat. Ann. art. 4495b (Vernon Supp.1984).

Medical Education, which accredits only programs in institutions aligned with allopathic medicine. The district court, 565 F.Supp. 1440, held that the hospital rule unconstitutionally denied osteopathic physicians equal protection of the laws, in violation of the fourteenth amendment. We affirm the judgment on the basis that a state agency's discriminatory action when state law commands equality is a patent denial of equal protection to those denied equality.

## I.

John Peter Smith Hospital is operated by the Tarrant County Hospital District, a Texas state agency. Before 1974, the hospital bylaws permitted a physician to be a member of its staff only if he was a member of the Tarrant County Medical Society, an association which admitted only allopaths. In 1974, this was changed to require graduation with a degree of Doctor of Medicine (M.D.) from a school accredited by the Council on Medical Education of the American Medical Association. The Council accredits only allopathic schools and only allopathic schools award the M.D. degree; osteopathic schools award the degree Doctor of Osteopathy (D.O.). The requirements for admission to the hospital staff were again changed in 1979. The requirement of an M.D. degree was deleted, and instead, staff members were required to be licensed by the state and to have two years of post-doctoral training in a program accredited by the Accreditation Committee.

The predecessor to the Accreditation Committee [2] was created in 1970, and none of the graduate training programs that existed before that time were accredited by it. To avoid disqualifying physicians who received training before 1970, the bylaws of the hospital were rewritten in 1980 and 1981 to require post-doctoral training in a program accredited by the Committee only for initial appointment to the staff. Physi-

cians already on the staff were thus automatically exempted from the requirement.

The parties stipulated that the sole reason the plaintiffs were denied staff privileges was because they had trained in osteopathic-institution programs. There are presently four osteopathic physicians on the staff of the hospital. Each of them, however, received post-doctoral training while in military service at hospitals approved by the predecessor to the Accreditation Committee.

In 1981, the Texas state legislature enacted the Medical Practice Act and declared its intention "to prohibit differentiation solely on the basis of the academic medical degree held by" a licensed physician in determining medical staff appointments.[3] The Act recognizes that all physicians are examined by the same board, pass the same examination, and meet the same standards, "irrespective of academic medical degree." [4] In order to be licensed under the Act, a physician must have graduated from an approved medical school, but both schools accredited by the Accreditation Committee and those accredited by the American Osteopathic Association are approved.

In findings not challenged on appeal, the district court found that presently there is no substantial difference between accredited medical schools conferring the M.D. degree and those that confer the D.O. degree except that students attending osteopathic schools are required to take several courses on manipulative therapy. The court described as non-substantial the philosophical differences between allopathy and osteopathy.

Until recently, osteopathic physicians were unable to obtain training in programs approved by the Accreditation Committee on Graduate Medical Education. Today, as we understand the record, they are able to

---

**2.** The accrediting group was originally the Liason Committee on Graduate Medical Education. This was changed in 1981 to the Accreditation Committee.

**3.** Tex.Rev.Civ.Stat.Ann. art. 4495b, Subchapter A, § 1.02(9) (Vernon Supp.1984).

**4.** *Id.*

do so in various governmental programs and certain other specialized programs.

## II.

The parties raise a number of issues, including whether it is reasonable for a hospital to treat allopathic and osteopathic physicians differently. Because of the later changes in medical education, the hospital invites us to follow, and the osteopathic physicians urge us to disregard, the Supreme Court's 1927 decision in *Hayman v. City of Galveston*.[5] The Court there held that a hospital's decision to exclude osteopaths was neither arbitrary nor unreasonable because it was based on the necessity of choosing between various methods of treatment. In the same opposing fashion, the parties also urge us to affirm or to reconsider and reject the statements in our opinion in *Berman v. Florida Medical Center, Inc.*,[6] an action dismissed because it involved a private hospital, but in which we said that a public hospital may deny staff privileges to a physician simply because he is an osteopathic physician.[7]

■ We find it unnecessary to reach so far. Equal protection of the law requires not only that statutes be equal on their face but also that they be executed so as not to deny equality.[8] "A law that is administered so as to unjustly discriminate between persons similarly situated may deny equal protection." [9] There is even more striking administrative discrimination when a state law that ordains equal treatment is applied so as to deny that equality

the statute requires. The fact that the discriminatory action is taken by a state agency other than the legislature does not permit it to escape the fourteenth amendment for "state action, of the kind that falls within the prescription of the Equal Protection Clause of the Fourteenth Amendment, may be brought about through the state's administrative and regulatory agencies just as through the legislature." [10]

■ The Texas Medical Practice act expressly mandates that Texas institutions accord equal treatment "to all who desire to practice medicine, irrespective of academic medical degree." [11] Thus, the Texas legislature has determined that, for purposes of determining medical staff appointments, osteopathic and allopathic physicians are "similarly situated." Because the Tarrant County Hospital District's bylaws discriminate between persons similarly situated, those osteopathic physicians who are now excluded from admission to the hospital staff solely because their training was in a program approved by the American Osteopathic Association rather than by the Accreditation Committee have been denied the equality afforded them by Texas law.

■ Federal constitutional protection may turn on state-created rights. Thus, whether a state employee who has been discharged without notice and hearing has been denied property without due process depends on whether he had state-created rights that created a cognizable property interest in his continued employment.[12]

---

**5.** 273 U.S. 414, 47 S.Ct. 363, 71 L.Ed. 714 (1927).

**6.** 600 F.2d 466 (5th Cir.1979).

**7.** *But see Dooley v. Barberton Citizen's Hospital,* 11 Ohio St.3d 216, 465 N.E.2d 58 (1984) (hospital may not adopt standards for staff membership that are not reasonably related to accepted measures of skill, education and competence).

**8.** *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

**9.** *Guillory v. County of Orange,* 731 F.2d 1379, 1383 (9th Cir.1984); *Kuzinich v. County of Santa Clara,* 689 F.2d 1345, 1349 (9th Cir.1982); *Zeigler v. Jackson,* 638 F.2d 776, 779 (5th Cir. 1981).

**10.** *Robinson v. State of Florida,* 378 U.S. 153, 156, 84 S.Ct. 1693, 1695, 12 L.Ed.2d 771 (1964); *see Columbus Board of Education v. Penick,* 443 U.S. 449, 457 fn. 5, 99 S.Ct. 2941, 2946 fn. 5, 61 L.Ed.2d 666 (1979).

**11.** Tex.Rev.Civ.Stat.Ann. art. 4495b, Subchapter A, § 1.02(9) (Vernon Supp.1984).

**12.** *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 578, 92 S.Ct. 2701, 2709–10, 33 L.Ed.2d 548 (1972). *See also Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430–31, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982); *Jones v. Orleans Parish School Board,* 679 F.2d 32, 36 (5th Cir.1982), *cert. denied,* 461 U.S. 951, 103 S.Ct. 2420, 77 L.Ed.2d 1310 (1983).

Similarly, when the state creates a school system, it creates an entitlement in students, giving them a right to attend unless that right is terminated with due process of law.[13]

Because the state itself has required its agencies to treat allopathy and osteopathy alike, it is not necessary for us to consider whether the state might, if it chose to do so, find a rational basis for distinguishing between allopathic and osteopathic physicians generally. The Texas Medical Practice Act mandates that Texas institutions must accord equal treatment to professionals educated in either philosophy.

The hospital contends that, because the Act was adopted in 1981, it is not applicable in this case which concerns a standard adopted in 1979. This disregards both the nature of this action, a suit to affect future, instead of past, actions, and the rule stated by the Supreme Court in *Bradley v. School Board of the City of Richmond:*[14] "[A] court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary."[15]

The hospital makes the sophistic argument that its admission requirement does not turn on the physician's academic medical degree, but on the nature of the institution at which he received his post-doctoral training. Those physicians who were excluded by the requirement, however, were prevented from receiving training in a program acceptable to the Accreditation Committee by the fact that they had D.O. degrees, and they were able to receive equivalent training only in an osteopathic-institution program. The nature of their academic medical degree, therefore, is the differentiating factor.

For these reasons, the judgment is affirmed insofar as it applies to osteopathic physicians who received their post-doctoral training before they could be admitted to a program accredited by the Accreditation Committee. Because the question was not presented below and not urged to us on appeal, we express no opinion on the constitutionality of the hospital rule as applied to osteopaths who now have, or who have had in the past, the opportunity, equally with allopaths, to attend a training program accredited by the Accreditation Committee, but choose not to exercise that option.

The district court judgment is, therefore, AFFIRMED.

CLARK, Chief Judge, concurring:

I concur without reservation in what Judge Rubin writes. I add these comments because I regard the dissent's reliance on *McDowell v. Texas* as misplaced. 465 F.2d 1342 (5th Cir.1971), *aff'd on rehearing en banc,* 465 F.2d 1349 (5th Cir.1972), *cert. denied,* 410 U.S. 943, 93 S.Ct. 1371, 35 L.Ed.2d 610 (1973).

The essential distinction between today's case and *McDowell* lies in the nature of the right affected. Dr. McDowell's claim was based on his dismissal from a non-tenured position as administrator of a Texas institution for retarded children. He asserted that his dismissal resulted from his refusal to violate state law by admitting to his institution a child not entitled to admission. The proof established that Dr. McDowell's discharge caused him no stigma nor injury to his reputation. Indeed, he immediately received many offers for employment and promptly accepted one at an increase in pay. Thus, we held that no federal constitutional right was asserted in the discharge. The only violation of state law involved merely furnished the occasion for the state to act to terminate his at-will employment. Both *Perry v. Sindermann,*

---

13. *Goss v. Lopez,* 419 U.S. 565, 573–74, 95 S.Ct. 729, 735–36, 42 L.Ed.2d 725 (1975); *Debra P. v. Turlington,* 644 F.2d 397, 403–04 (5th Cir.1981).

14. 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974).

15. *Id.* at 711, 94 S.Ct. at 2016, 40 L.Ed.2d 476 (1979). The Fifth Circuit, of course, follows the Supreme Court's enunciation. *See Petrou Fisheries, Inc. v. I.C.C.,* 727 F.2d 542, 545 (5th Cir. 1984); *Sandefur v. Cherry,* 718 F.2d 682, 684 (5th Cir.1983).

408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), and *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), intervened between the *McDowell* panel and en banc opinions to furnish confirmation satisfactory to a unanimous court that the property right asserted by Dr. McDowell was not of a nature which was cognizable under the fourteenth amendment.

Dr. Stern's case is altogether different. The law of the State of Texas expressly requires that his medical degree be accepted as the equivalent of that possessed by an allopathic doctor. But, the John Peter Smith Hospital refuses to accord him the concomitant right to staff privileges which Texas has granted.

This arbitrary state action depriving Dr. Stern of the right to practice his profession in a state hospital deprives him of a property right clearly within the protection of the fourteenth amendment. In *Roth,* the Supreme Court explained the attributes of "property" interests which come within the ambit of the Federal Constitution in these terms:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined....
>
> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understanding that secure certain benefits and that support claims of entitlement to those benefits...."

408 U.S. at 577, 92 S.Ct. at 2709.

In *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982), the Court further stated:

> The hallmark of property, the Court has emphasized, is an individual entitlement grounded in state law, which cannot be removed except "for cause." ... Once that characteristic is found, the types of interests protected as "property" are varied and, as often as not, intangible, relating "to the whole domain of social and economic fact." (Citations omitted.)

Neither *Hayman* nor *Berman* viewed hospital staff privileges as beyond the reach of federal constitutional protection because the nature of staff privileges was unimportant. Rather, the analysis in those cases turned on the rationality of the state's choice to prefer allopathy over osteopathy. Each found that the state action in distinguishing the two practices bore a rational relationship to a valid state objective. Because this was so, the action denying equal rights to the two schools of medicine implicated no constitutional values. Texas has decided that issue differently. This difference, having been recognized, invests Dr. Stern with an important right to equal treatment with allopathic physicians that cannot be arbitrarily denied by the John Peter Smith Hospital without breaching the fourteenth amendment.

GOLDBERG, Circuit Judge, dissenting:

This is not a happy dissent. While personally I do not condone discrimination against osteopaths, I believe that we are bound by *Hayman v. City of Galveston,* 273 U.S. 414, 47 S.Ct. 363, 71 L.Ed. 714 (1927), and *Berman v. Florida Medical Center,* 600 F.2d 466 (5th Cir.1979), which held that hospitals could discriminate against osteopaths in admitting physicians to their staffs. Because, in my view, *Hayman* and *Berman* represent the current law, they must be applied. Our job as judges, unlike that of doctors, does not include offering second opinions.

In an attempt to bypass *Hayman* and *Berman,* the majority argues that the hospital's bylaw violates Texas law, and that violations of state law by a state entity

constitute *per se* violations of federal equal protection. I believe that this represents a novel and unwarranted theory of equal protection. Although, as judges, we cannot offer second opinions, we can offer dissenting opinions. I dissent.

**A**

An analysis of the hospital's regulation must begin with *Hayman v. City of Galveston*, 273 U.S. 414, 47 S.Ct. 363, 71 L.Ed. 714 (1927). In *Hayman*, the Supreme Court upheld a hospital regulation that excluded osteopathic physicians from the hospital staff on the ground that the hospital's classification was "not arbitrary or unreasonable on its face." *Id.* at 417, 47 S.Ct. at 364. In reaching this result, Justice Stone, writing for the Court, stated:

> We cannot say that a regulation excluding from the conduct of a hospital the devotees of some of the numerous systems or methods of treating diseases authorized to practice in Texas, is unreasonable or arbitrary. In the management of a hospital, ... some choice in methods of treatment would seem inevitable, and a selection based upon a classification having some basis in the exercise of the judgment of the state board whose action is challenged is not a denial of the equal protection of the laws.

*Id.* Although *Hayman* was decided before the doctrinal distinction between "strict scrutiny" and "rationality review" was clearly drawn,[1] *Hayman* stands for the dual propositions that (1) osteopathic physicians are not a suspect class, and (2) classifications based upon a physician's medical degree—including whether that degree is osteopathic or allopathic—are rational.

The plaintiffs contend that *Hayman* is no longer good law because of the advances in osteopathic medicine since 1927, when *Hayman* was decided. They argue that while it may have been rational to discriminate against osteopaths in 1927, it is no longer rational to do so. This argument raises difficult jurisprudential questions concerning whether we, as a court of appeals, can pick and choose among Supreme Court precedents on the basis of which ones we think remain legitimate. Fortunately, we need not decide these questions in the present case, since we have recently reiterated the principles underlying *Hayman* in *Berman v. Florida Medical Center*, 600 F.2d 466 (5th Cir. 1979). In *Berman*, we gave a clean bill of health to a hospital regulation precisely like the one in question here, which required applicants for staff appointments to have served in an A.M.A.-approved residency program. *Id.* at 468. As we stated:

> That [the plaintiffs] may have received equivalent training of another sort does not invalidate the hospital's requirement, which is a reasonable one. Doubtless there are midwives in the Fort Lauderdale area quite capable of handling normal childbirths, but this circumstance would scarcely render the requirement of a medical license for practice in this hospital unconstitutional or invalid. Having specified a reasonable means of access to its staff privileges, defendant is not required to shell the woods, canvassing one by one other modes that might or might not be its equivalent.

*Id.*[2] I believe that we are constrained under both *Hayman* and *Berman* from hold-

---

1. Although the Supreme Court has always implicitly applied different levels of scrutiny to different kinds of legislative classifications, *compare Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911) (environmental regulation) *with Strauder v. West Virginia*, 100 U.S. (10 Otto) 303, 25 L.Ed. 664 (1880) (race), the "two-tier" approach to equal protection first received explicit expression in *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938).

2. The plaintiffs argue that *Berman* is not controlling since it was decided on state action grounds and since therefore the statements in *Berman* regarding the rationality of the hospital's regulation are merely dicta. I believe, however, that this represents a misreading of *Berman*. In *Berman*, the court discussed at comparative length the permissibility under the equal protection clause of the hospital's regulation; only in the last paragraph did the court reach the state action question, stating, "Finally, *if more be required*, we concur in the trial court's conclusion ... that the state statute re-

ing that the hospital's discrimination against osteopaths violates the equal protection clause.

## B

Implicitly recognizing the force of *Hayman* and *Berman*, the majority attempts to sidestep them by focusing on the Texas statute prohibiting discrimination against osteopaths. The majority does not claim that discrimination against osteopaths itself offends against equal protection—that avenue is foreclosed by *Hayman* and *Berman*. Instead, the majority uses state law to bootstrap a federal equal protection violation.

In my view, this is a novel theory of equal protection, without support in our precedents. Previously, I had thought that a violation of state law was a violation of state law; I had not realized that it could also give rise to a violation of federal equal protection. Although I believe that I have always been a stout and ardent defender of equal protection, I fail to see how state law can provide the basis of a federal equal protection claim.

The equal protection clause embodies a general requirement that equals be treated equally. In itself, this requirement of equal treatment is a purely formal proposition, without any substantive content, since it does not tell us what people are equal.[3] As interpreted over the years, however, the equal protection clause is not a mere formalistic requirement; rather, it imposes certain substantive notions of equality by forbidding government from classifying among people in certain ways[4]—for example, on the basis of race or national origin. For purposes of the equal protection clause, people of different races and different national origins are equal; therefore race and national origin as such cannot be the basis of government classifications.

In *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), the Supreme Court extended the scope of the equal protection clause to include classifications based on administrative as well as legislative action. If government classifies among people in an impermissible way in the execution of its laws, then this violates equal protection just as much as would a similar statutory classification. Contrary to the majority's assertion, however, *Yick Wo* did not change the underlying basis of equal protection analysis: does the state's classification, whether legislative or administrative, violate *federal* norms of equality? In *Yick Wo*, the Supreme Court held that the state's classification did violate federal norms, since it was based on national origin. As the Court stated, "The fact of ... discrimination [against Chinese people] is admitted. No reason for it is shown, and the conclusion cannot be resisted that no reason for it exists except hostility to the race and nationality to which the petitioners belong, and which, in the eyes of the law, is not justified." *Id.* at 374, 6 S.Ct. at 1073.[5]

---

garding hospital licensing does not sufficiently implicate Florida in defendant's staff-admission policies to constitute 'state action.'" *Id.* (emphasis added). Since, to me, this seems an odd way to state the *ratio decidendi* of a case, I conclude that *Berman* was decided on equal protection as well as on state action grounds.

3. "Equals or unequals, yes, but equals or unequals in what." Aristotle, *Politics*, Bk. III, § 12, 1282 b 22; *see also* Benn, *Equality, Moral and Social*, in 3 Encyclopedia of Philosophy 38 (P. Edwards ed. 1967); A. France, *quoted in Aphorisms* 208 (W. Auden & L. Kronenberger eds. 1962) ("The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges.").

4. *See* Karst, *Foreword: Equal Citizenship Under the Fourteenth Amendment*, 91 Harv.L.Rev. 1, 4

(1977) ("Equality, as an abstraction, may be value-neutral, but the fourteenth amendment is not."); Perry, *Modern Equal Protection: A Conceptualization and Appraisal*, 79 Colum.L.Rev. 1023, 1031 (1979) (the basic principle of equal protection is that "there are some traits and factors—of which race is the paradigmatic example—by virtue of which no person ought to be deemed morally inferior to any other person").

5. The other cases cited by the majority stand for the same proposition, namely, that state administrative as well as legislative action must comply with federal norms of equality. *See Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 457 n. 5, 99 S.Ct. 2941, 2946 n. 5, 61 L.Ed.2d 666 (1979) (racial segregation); *Robinson v. Florida*, 378

The majority enunciates a quite different model of equal protection analysis. Rather than analyzing whether the state administrative classification violates federal norms of equality, the majority focuses on whether the state administrative classification violates *state* norms of equality. According to the majority, if a state statute classifies certain groups of people as "equal," then federal equal protection mandates that these "equals" be treated equally in the administration of the law.[6] This is a quite different principle from the one enunciated in *Yick Wo.* Indeed, in *Yick Wo,* no violation of state norms of equality was involved: state law permitted the challenged discrimination by giving the state administrative body discretion in granting exemptions from the statute.[7]

All of the cases cited by the majority in support of its theory, *see,* at 433 n. 9, 433 n. 12, either are due process, not equal protection, cases or are concerned with classifications that offend federal, not state, norms of equality. *Kuzinich v.*

*County of Santa Clara,* 689 F.2d 1345 (9th Cir.1982), for example, involved a claim that the state classification infringed on a fundamental federal right, free speech. Indeed, the court specifically stated, "appellant must show that his selection was based on an impermissible ground such as race, religion or his exercise of his first amendment right to free speech." *Id.* at 1349 (quoting *United States v. Scott,* 521 F.2d 1188, 1195 (9th Cir.1975)). Similarly, both *Guillory v. County of Orange,* 731 F.2d 1379 (9th Cir.1984), and *Zeigler v. Jackson,* 638 F.2d 776 (5th Cir.1981), involved claims that state administrative action lacked any rational basis. *See Guillory,* 731 F.2d at 1383 (plaintiffs claimed that they were treated differently for "no rational reason"); *Zeigler,* 638 F.2d at 779 (state administrative body "failed to offer a rational justification for the differential treatment accorded to [plaintiff]"). All of these cases fit comfortably within traditional equal protection analysis and do not stand for the majority's novel theory.[8]

U.S. 153, 156, 84 S.Ct. 1693, 1695, 12 L.Ed.2d 771 (1964) (racial discrimination).

**6.** In his concurrence, Chief Judge Clark suggests an alternative theory of equal protection as the ground for the majority's decision. In his view, state law defines not the classes that are deemed to be equal, but rather the rights (including the right to employment) that are entitled to heightened protection under the fundamental rights strand of equal protection analysis. While this theory is cast in different doctrinal terms than the majority's, to me it seems just as novel and unwarranted. The procedural due process cases, as both the majority and the Chief Judge note, have held that state law can define property rights that are entitled to certain procedural protections under the due process clause of the fourteenth amendment. I am unaware, however, of any cases that have held that these state-created property rights give rise to heightened scrutiny under the fundamental rights strand of equal protection analysis. Nor am I sure what form such heightened scrutiny would take. My brother Clark appears to say that, once a state has granted a certain property right, then that right cannot be infringed, regardless of what procedures are used. *See infra* note 7. I agree that this may be true as a matter of state law, but unless we want to constitutionalize much of state law, I fail to see how this is true as a matter of federal equal protection.

**7.** The majority not only departs from traditional equal protection analysis by looking to state rather than federal law as the source of its substantive norms of equal protection; it also eschews the traditional standards of review used in equal protection analysis. Rather than applying either strict scrutiny or rationality review to the hospital's regulation, the majority implicitly holds that the hospital's regulation is a *per se* violation of federal equal protection. Thus, the majority paradoxically applies an even stricter standard of review when examining state administration of a state law than it would when examining an alleged racial classification.

**8.** The majority also finds precedent for its position in a number of due process cases where courts have looked to state law to define federally-protected rights. In these due process cases, however, state-defined property rights merely triggered federal due process analysis; state law did not define the procedures that were due. Consequently, in these cases, unlike the present one, the federal cause of action was not parasitic on the existence of a state-law violation. Indeed, in both of the Supreme Court cases cited by the majority, no violation of state law was involved. *See Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 427–28, 102 S.Ct. 1148, 1153, 71 L.Ed.2d 265 (1982) (state supreme court had ruled that there was no violation of state law); *Board of Regents v.*

While few cases have squarely addressed the issue, what little authority I have found rejects the principle announced by the majority today. For example, in *Snowden v. Hughes*, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944), Chief Justice Stone, writing for the Court, stated, "[N]ot every denial of a right conferred by state law involves a denial of the equal protection of the laws, even though the denial of the right to one person may operate to confer it on another." *Id.* at 8, 64 S.Ct. at 401. Chief Justice Stone went on to note that the action of a state board "is subject to constitutional infirmity to the same *but no greater extent* than if the action were taken by the state legislature. *Its legality under the state statute can neither add to nor subtract from its constitutional validity.*" *Id.* at 11, 64 S.Ct. at 402 (emphasis added).

Similarly, in *McDowell v. Texas*, 465 F.2d 1342, *aff'd on rehearing en banc*, 465 F.2d 1349 (5th Cir.1971), *cert. denied*, 410 U.S. 943, 93 S.Ct. 1371, 35 L.Ed.2d 610 (1973), we rejected a claim that a violation of state law by a state board gave rise to a denial of federal substantive due process. *Id.* at 1345–46. What we said there in regard to substantive due process is equally applicable here:[9]

> Cases of this genre constitute uniquely State causes of action. As such they are peculiarly within the realm of State courts. "A right to have state (or city) laws obeyed is a state, not a federal right." .... Even though it is patent

that the amorphous and protean contours of substantive due process under the Fourteenth Amendment extend to all citizens in all sorts of conditions and circumstances, it is equally axiomatic that federal jurisdiction under § 1343(3) and 42 U.S.C.A. § 1983 cannot be extended to that purely local squabble by the mere invocation of the generalized protection which these words of the amendment confer.

The Constitution's deeply embedded concepts of federalism demand that we refuse a procedure of statutory construction that would put such a literal gloss on the words of §§ 1343 and 1983 as would kill the spirit the founding fathers quickened when the people of the sovereign states ceded sufficient governmental power to form a sovereign union.... If we were to distort §§ 1343 and 1983 to vest federal courts with jurisdiction over the uniquely local substantive matters which this case presents, we would not only impair our ability to consider the vast array of cases that properly belong in federal forums but, as surely as sunrise, we [would] create yet another and an unnecessary interference with orderly State processes.

Only if a false vanity duped us into supposing that the quality of justice in the federal court system is somehow superior to that dispensed by the State, could we justify such an incursion into intrastate affairs. To the contrary, State

---

*Roth*, 408 U.S. 564, 567, 92 S.Ct. 2701, 2704, 33 L.Ed.2d 548 (1972) (state law left employment decisions to unfettered discretion of university officials). Thus, exercise of federal jurisdiction was neither superfluous nor potentially intrusive on matters of primary interest to the states. Instead, it was necessary to protect federally-defined procedural rights.

9. Chief Judge Clark attempts to distinguish *McDowell* on the ground that, in *McDowell*, no claim was made that a violation of state law directly gave rise to a violation of the fourteenth amendment. According to Chief Judge Clark, the challenged firing did not itself violate state law, since the plaintiff's continued employment was at the will of the state. Because the plaintiff did not have a state-law property right to continued employment, there clearly was no violation of the fourteenth amendment. A violation of state law was only implicated to the extent that an earlier violation of state law provided the pretext for the firing of the plaintiff by the state. Therefore, according to the Chief

Judge, we were not presented in *McDowell* with the question that we face here.

In my view, this represents a considerable gloss on *McDowell*. Although the opinion did not specify what exact violation of state law was involved, it did strongly imply that the plaintiff claimed that his dismissal itself violated state law, not merely that an antecedent state law violation provided the pretext for his dismissal. As the court put the issue in *McDowell*, "[W]as a federal statutory or Constitutional right involved when a State Board fired a State employee *contrary to State law* for local political considerations?" 465 F.2d at 1345 (emphasis added). The court concluded that even though the plaintiff may have had a state-law right to continued employment, this state-law right did not give rise to a federal constitutional right. *Id.* at 1346. "Cases of this genre constitute uniquely State causes of action. As such they are peculiarly within the realm of State courts." *Id.*

courts are best equipped to determine the meaning and the scope of State statutes and local policies and to determine whether State officials encroached upon [the plaintiff's] rights of due process which are fully preserved in Texas courts by the Texas and the federal Constitution.

*Id.* at 1346 (citations omitted).[10]

The majority does not discuss the parameters of its principle of equal protection, but its theory appears to have very broad consequences.[11] One potential consequence is that *federal* equal protection must always provide at least as much protection as *state* equal protection; whenever state equal protection is expanded by a state court decision, federal equal protection (in that state) must follow. For example, if the California Supreme Court held that discrimination against persons over fifty years of age violated California's equal protection clause, then, under the majority's theory, discrimination against persons over age fifty (in California) would also become a violation of federal equal protection (despite the Supreme Court's apparent resolution of the federal equal protection issue in *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (state statute setting mandatory retirement age of fifty for policemen does not violate federal equal protection)). According to the rule enunciated by the majority, because California state law would require equal treatment of people under and over fifty, the action of a California state agency that discriminated between groups for whom state law required equal treatment would be a denial of federal equal protection.[12]

While I have little sympathy with efforts to restrict a litigant's access to federal courts where *federal* rights are involved, I believe, in contrast to the majority, that infringements on rights created by state

---

**10.** The First Circuit reached the same conclusion in *Creative Environments, Inc. v. Estabrook,* 680 F.2d 822 (1st Cir.), *cert. denied,* 459 U.S. 989, 103 S.Ct. 345, 74 L.Ed.2d 385 (1982). There the plaintiff argued that its due process rights had been violated by the town's distortion of the existing statutory and regulatory subdivision scheme. The First Circuit, in rejecting this claim, stated that if the plaintiff's theory were accepted,

> any hope of maintaining a meaningful separation between federal and state jurisdiction in this and many other areas of law would be jettisoned. Virtually every alleged legal or procedural error [by the state] ... could be brought to a federal court on the theory that the erroneous application of state law amounted to a taking of property without due process.
> ....
> [T]he conventional planning dispute—at least when not tainted with fundamental procedural irregularity, racial animus, or the like—which takes place within the framework of an admittedly valid state subdivision scheme is a matter primarily of concern to the state and does not implicate the Constitution. This would be true even were planning officials to clearly violate, much less "distort" the state scheme under which they operate.

*Id.* at 831, 833. As the court continued, "[The plaintiff] may quite possibly have state law claims on the facts alleged. If so, there appear to be adequate state law remedies to vindicate these claims without resort to a federal court." *Id.* at 833; *see also Simmons v. Jones,* 478 F.2d 321, 328, 329 (5th Cir.1973), (violation of state law does not give rise to violation of federal equal protection "without a showing of system-

atic exclusion on the basis of race or some other ground forbidden by national policy"; "[s]tripped of its flimsy constitutional trappings [plaintiff's] complaint basically was an effort to enlist a federal court in a campaign to achieve a more faithful application ... of Georgia's statutory scheme") *modified on other grounds,* 519 F.2d 52 (5th Cir.1975); *Cloutier v. Town of Epping,* 714 F.2d 1184 (1st Cir.1983) (equal protection as well as due process claim denied); *Crocker v. Hakes,* 616 F.2d 237, 240 (5th Cir. 1980) ("mere ... mistakes of state law do not rise to the level of constitutional violations").

**11.** Indeed, to the extent that "classification is the essence of all legislation," *Clements v. Fashing,* 457 U.S. 957, 967, 102 S.Ct. 2836, 2845, 73 L.Ed.2d 508 (1982); *see also* Perry, *supra* note 4, at 1068 ("every time a legislature enacts a law ... it classifies"), *every* violation of state law is a violation of federal equal protection. For example, if a state improperly denied someone unemployment benefits, then it would be discriminating against him by treating him as a member of the group ineligible for unemployment benefits rather than as a member of the group eligible for such benefits under the state's unemployment compensation scheme.

**12.** Similarly, the majority's theory would have allowed a simple resolution of many of the legislative reapportionment cases. In *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), for example, the state apportionment plan was admittedly in violation of Alabama's constitution. *Id.* at 540–41 & n. 4, 84 S.Ct. at 1370 & n. 4. Under the majority's view, Alabama's apportionment scheme was a *per se* violation of federal equal protection.

law are best left to state courts.[13] This conclusion is far more compatible than the majority's with the principles of federalism that underlie many of our basic constitutional doctrines, including the doctrines that state court determinations of state law are final,[14] and that federal courts should refrain from exercising jurisdiction in order to avoid needless conflict with the administration by a state of its own affairs.[15] The difficulties encountered in the present case of determining whether or not the hospital's regulation does violate state law [16] is a good illustration of why state courts should have primary jurisdiction over enforcing their own laws. Although the majority's theory could be defended in terms of "keeping the states honest," [17] I believe that the enforcement of state law is a matter primarily of concern to the states. Ultimately, I believe that the majority's theory trivializes equal protection by shifting attention away from its primary function: imposing substantive restrictions on the ways in which government can govern.

Thus, although I recognize that a malady may lurk within the body politic of Tarrant

---

**13.** The majority's attempt to derive an equal protection violation from a violation of state law would, doctrinally, be more properly placed within the framework of traditional "rational basis" analysis. To the extent that rational basis analysis involves an inquiry into the state's actual reasons for a classification, rather than merely into conceivable reasons, see *McGinnis v. Royster*, 410 U.S. 263, 270, 93 S.Ct. 1055, 1059, 35 L.Ed.2d 282 (1973) (state classification must rationally further "some legitimate, articulated state purpose"); *Schlesinger v. Ballard*, 419 U.S. 498, 520, 95 S.Ct. 572, 584, 42 L.Ed.2d 610 (1975) (Brennan, J., dissenting), then the rationality of a state classification may depend on state law. *See generally* Gunther, *Foreword: In Search of Evolving Doctrine on a Changing Court: A Model of a Newer Equal Protection,* 86 Harv.L.Rev. 1 (1972). In the present case, for example, it could be argued that, by passing the Texas Medical Practices Act, Texas has expressly disavowed any interest in discriminating against osteopaths, and that therefore the hospital's bylaw is irrational. On this theory, *Hayman* and *Berman* would be distinguishable, since they did not involve state statutes forbidding discrimination in the admission of physicians to hospital staffs. *See Hayman,* 273 U.S. at 418, 47 S.Ct. at 364; *Berman,* 600 F.2d at 467.

In recent years, however, the Supreme Court and this court have reaffirmed their adherence to the conceivable basis test of rationality. *See, e.g., United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980); *Town of Ball v. Rapides Parish Police Jury,* 746 F.2d 1049, 1061 (5th Cir.1984). By focusing on conceivable rather than on actual bases for a state classification, the courts have interpreted the rational basis prong of equal protection in terms of a *federal* standard of minimum rationality. Thus, even with rational basis analysis, state law is not the touchstone of validity under the equal protection clause.

**14.** *E.g., Mullaney v. Wilbur,* 421 U.S. 684, 691, 95 S.Ct. 1881, 1886, 44 L.Ed.2d 508 (1975); *Murdock v. City of Memphis,* 87 U.S. (20 Wall.) 590, 632–33, 22 L.Ed. 429 (1874). *See generally* C. Wright, *Federal Courts* 747 (4th ed. 1983).

**15.** *E.g., Alabama Pub. Serv. Comm'n v. Southern Ry. Co.,* 341 U.S. 341, 349, 71 S.Ct. 762, 768, 95 L.Ed. 1002 (1951) ("As adequate state court review of an administrative order based upon predominantly local factors is available to appellee, intervention of a federal court is not necessary for the protection of federal rights."); *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) (administration of complicated state regulatory system should be left to state administrative bodies and courts); *Simmons v. Jones,* 478 F.2d 321, 328 (5th Cir. 1973) ("As a matter of comity, the district court should have afforded the Georgia courts the opportunity to rectify alleged deviations from the requirements of Georgia law...."). *modified on other grounds,* 519 F.2d 52 (5th Cir.1975).

**16.** As the majority notes, Texas law forbids only discrimination based "solely" on a physician's medical degree. Thus, if osteopaths were able to attend LCGME-approved residency programs but chose not to, or if some allopaths as well as osteopaths were excluded from admission to the hospital's staff as a result of the hospital's bylaw, then the hospital would not be discriminating among physicians based *solely* on their medical degree. The record concerning both of these points is extremely unclear; it appears that some of the plaintiffs may have had an opportunity to attend allopathic residency programs, *see* Record, vol. 2 at 50, and that allopaths who received their residency training prior to 1970, when the LCGME was established, may not be eligible for appointment to the hospital staff, *see id.,* vol. 3 at 415–16. The plaintiffs did not allege a violation of Texas law in their complaint. As I read the findings of fact below, the district court did not specifically find that Texas law was violated, nor do its findings necessarily imply this conclusion. Although the majority assumes that the hospital's regulation does violate Texas law, I am far from certain that this is the case.

**17.** For an analogous argument that the Guarantee Clause, U.S. Const. art. IV, § 4, cl. 1, requires that states follow their own laws, *see* Note, *The Rule of Law and the States: A New Interpretation of the Guarantee Clause,* 93 Yale L.J. 561 (1984).

County, the cure must come from the salving influence of state rather than federal law. I disagree with the majority's equal protection diagnosis and, accordingly, though respectfully, dissent.

## ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC

Before CLARK, Chief Judge, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS and HILL, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the suggestion for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that this cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.