Paul A. STERN, et al.,
Plaintiffs-Appellees,

v.

**TARRANT COUNTY HOSPITAL DISTRICT, Defendant-Appellant,**

v.

**George J. LUIBEL, Defendant-Appellee.**

No. 83–1638.

United States Court of Appeals,
Fifth Circuit.

Dec. 18, 1985.

Tim Curry, Crim. Dist. Atty., Frederick M. Schattman, Fort Worth, Tex., for Tarrant County Hosp. Dist.

Bailey, Williams, Westfall, Lee & Fowler, Kevin J. Keith, Dallas, Tex., for Stern, et al.

Law, Snakard, Brown & Gambill, Alan Wilson, Fort Worth, Tex., for George J. Luibel.

Before CLARK, Chief Judge, and GOLDBERG, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, HILL and JONES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

 We reaffirm today the settled constitutional rule that state agencies may pursue legitimate purposes by any means having a conceivable rational relationship to those purposes. A decision that passes constitutional muster under the rational-basis test does not violate the equal protection clause simply because it violates a state anti-discrimination statute.

I

Five osteopaths were denied staff privileges by the John Peter Smith Hospital, which is operated by the Tarrant County Hospital District, a Texas state agency, because they had trained in an osteopathic institution and not in an allopathic program. Their attack upon the constitutionality of this exclusion was sustained by the district court after a trial on the merits. The district court, 565 F.Supp. 1440, held that the hospital had unconstitutionally denied the osteopathic physicians equal protection under the law and thereby violated the fourteenth amendment. This judgment was affirmed by a divided panel of our court. A majority of the judges of this court voted to consider the case *en banc*, thereby vacating the panel opinion. It is the judgment of the district court that we now review.

The factual background, as recited by the panel, is as follows:

John Peter Smith Hospital is operated by the Tarrant County Hospital District, a Texas state agency. Before 1974, the hospital bylaws permitted a physician to be a member of its staff only if he was a member of the Tarrant County Medical Society, an association which admitted only allopaths. In 1974, this was changed to require graduation with a degree of Doctor of Medicine (M.D.) from a school accredited by the Council on Medical Education of the American Medical Association. The Council accredits only allopathic schools and only allopathic schools award the M.D. degree; osteopathic schools award the degree Doctor of Osteopathy (D.O.). The requirements for admission to the hospital staff were again changed in 1979. The requirement of an M.D. degree was deleted, and instead, staff members were required to be licensed by the state and to have two years of post-doctoral training in a program accredited by the Accreditation Committee [on Graduate Medical Education]. [The Accreditation Committee is affiliated with the AMA and accredits only programs in institutions aligned with allopathic medicine.]

. . . .

The parties stipulated that the sole reason the plaintiffs were denied staff privileges was because they had trained in osteopathic-institution programs [rather than in programs approved by the Accreditation Committee]. . . .

In 1981, the Texas state legislature enacted the Medical Practice Act and declared its intention "to prohibit [state-agency hospitals from differentiating] solely on the basis of the academic medical degree held by" a licensed physician in determining medical staff appointments. [Tex.Rev.Civ.Stat.Ann. art. 4495b, Subchapter A, § 1.02(9) (Vernon Supp.1984).] The Act recognizes that all

physicians are examined by the same board, pass the same examination, and meet the same standards, "irrespective of academic medical degree." [*Id.*] In order to be licensed under the Act, a physician must have graduated from an approved medical school, but both schools accredited by the Accreditation Committee and those accredited by the American Osteopathic Association are approved.

[The plaintiffs in this case, Dr. Paul Stern and four other osteopaths, each of whom has had at least two years of post-doctoral training in a program accredited by the American Osteopathic Association, challenge the county hospital's refusal to grant them staff privileges.][1]

## II

### –1–

The district court held that the hospital's rule denying staff privileges to those who trained in osteopathic-institution programs violated the plaintiffs' fourteenth amendment right to equal protection of the laws. The court found no justification for the hospital's requirement, save to exclude osteopaths from the hospital staff. That exclusion was itself irrational, the court concluded, because there were no significant differences between the qualifications of allopaths and osteopaths.

The district court noted the contrary decision of the Supreme Court in *Hayman v. City of Galveston*, 273 U.S. 414, 47 S.Ct. 363, 71 L.Ed. 714 (1927), but refused to be bound by that case, given the changes in medical education requirements for osteopaths that had ensued in the fifty years since *Hayman* was decided. The court then characterized as dicta language in our own decision in *Berman v. Florida Medical Center, Inc.*, 600 F.2d 466 (5th Cir. 1979), which upheld a similar rule that denied staff privileges to osteopaths. The district court did not mention our decision in *Maceluch v. Wysong*, 680 F.2d 1062 (5th Cir.1982), in which we rejected a challenge

by osteopaths to Texas' prohibition of their use of the initials "M.D."

Being in its view free of binding precedent, the district court concluded that there was no rational basis for the county hospital to treat allopaths and osteopaths differently, particularly in light of the contrary decision by the Texas legislature, as expressed in the Texas Medical Practice Act. Accordingly, the court struck down the hospital's rule as a violation of the equal protection clause.

### –2–

The panel opinion adopted a different rationale but reached the same conclusion as the district court. Rather than hold *Hayman* outdated or distinguish *Berman* and *Maceluch*, the panel found "it unnecessary to reach so far." 755 F.2d at 433. Arguing that the Texas legislature has, in the Texas Medical Practice Act, expressed the determination that there are no appreciable differences in the allopathic and osteopathic medical degrees and that the Act forbids state hospitals to confer or deny staff privileges "solely on the basis of academic medical degree," the panel found an equal protection violation, implicitly concluding that there is no rational basis for the county hospital's rule.

In the panel's view, the equal protection violation stems from the hospital's violation of state law, its apparent disregard of the state requirement that osteopaths and allopaths be treated equally:

> Because the state itself has required its agencies to treat allopathy and osteopathy alike, it is not necessary for us to consider whether the state might, if it chose to do so, find a rational basis for distinguishing between allopathic and osteopathic physicians generally. The Texas Medical Practice Act mandates that Texas institutions must accord equal treatment to professionals educated in either philosophy.

755 F.2d at 434.

Chief Judge Clark's concurring opinion endorsed this per se analysis and suggest-

---

1. 755 F.2d 430, 432. This factual recitation by the panel is unchallenged, and we adopt it here.

ed an alternative rationale—that the county hospital's rule is unconstitutional as a violation of the due process clause. Chief Judge Clark found a property interest for osteopaths in staff privileges at the county hospital because the Texas legislature has commanded that staff privileges at such hospitals shall not be denied on the basis of academic medical degree. He then found that depriving the plaintiffs of this property interest was necessarily arbitrary and thus a violation of the fourteenth amendment. His reasoning parallels the per se analysis: regardless of the rationality of the state's choice under *Hayman* or *Berman*, Texas has decided that there is no reason to distinguish osteopaths and allopaths, and there can be no rational basis for its agencies to continue to do so.

## III

■ We reject a per se equal protection analysis. The guarantees of the fourteenth amendment, its requirement that state laws be applied in the same way to those entitled to equal treatment and its promise of protection from arbitrary or irrational state action, are guarantees that turn on federal constitutional standards of equality and rationality rather than on state standards. Converting alleged violations of state law into federal equal protection and due process claims improperly bootstraps state law into the Constitution. In doing so, this novel approach would expand the scope of the fourteenth amendment, would render its meaning less certain, and would serve no legitimate policy.

–1–

The per se equal protection construct purports not to overrule or otherwise conflict with our decisions in *Berman* and *Maceluch* or the Supreme Court's decision in *Hayman:* it would permit the concession, but find it irrelevant, that a rational state legislature or state agency *might* distinguish between allopaths and osteopaths without violating the fourteenth amendment. Under the per se approach, a violation of federal equal protection is none-

theless found because the Texas legislature has enjoined its state hospitals to treat allopaths and osteopaths alike.

■ The per se approach assumes that by choosing to forbid discrimination against osteopaths, the state of Texas has necessarily made the contrary decision by its state-agency hospital an irrational one. We disagree. The outer constitutional limit imposed by the fourteenth amendment upon state power is that all the state's acts must be rational. In equal protection terms, if the legislative purpose be legitimate, a challenge "may not prevail so long as the question of rational relationship [to legislative purpose] is 'at least debatable.' " *Metropolitan Life Ins. Co. v. Ward,* —— U.S. ——, 105 S.Ct. 1676, 1683, 84 L.Ed.2d 751 (1985) (quoting *Western & S. Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 674, 101 S.Ct. 2070, 2086, 68 L.Ed.2d 514 (1981), and *United States v. Carolene Products Co.,* 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938)). *Cf. City of New Orleans v. Dukes,* 427 U.S. 297, 303–04, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976). When a legislature has a choice of means, each rationally related to its legislative purpose, it may constitutionally choose any of them. Its choice of one does not render the others irrational. It follows that acts violative of the chosen means, although by definition contrary to state law, are not *ipso facto* contrary to the fourteenth amendment. The constitutional test for rationality of a legislative classification, whether the classes be distinguished in the text of the law or in its administration, is whether *any* rational decisionmaker could have so classified.

–2–

The per se analysis is said to find its sustenance, at least in part, in *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). *See* 755 F.2d at 433 & n. 8. *Yick Wo,* however, does not support the conclusion. In *Yick Wo,* a San Francisco ordinance required consent from the Board of Supervisors before one could operate a laundry in a building made of materials

other than brick or stone. The Board granted permits for laundries in wooden buildings to all non-Chinese applicants save one, and to none of 200 Chinese applicants. 118 U.S. at 359, 6 S.Ct. at 1066. The Court reversed Yick Wo's conviction under the ordinance on the ground that, although the law was facially neutral, it had been applied so as to deny Chinese citizens equal protection of the laws. *Id.* at 362–63, 6 S.Ct. at 1067–68.

■ The principle of the case, broadly stated, is that when a facially neutral statute is administered so as to create classes, those classes must pass constitutional muster. The court struck it down because the sole basis for the classification was "hostility to ... race and nationality ... which in the eye of the law is not justified...." 118 U.S. at 374, 6 S.Ct. at 1073. Its rule differs from the central premise of the per se approach: the panel in this case determined that a facially neutral statute may not constitutionally be administered so as to treat differently classes that *the state has determined* are similarly situated. The distinction between the two rules is significant. *Yick Wo* recognizes that facially neutral state laws present the opportunity for discrimination, because they can be administered in a discriminatory fashion. But *Yick Wo* does not replace the Constitution with state law as the benchmark that determines which classifications are permissible. That task is necessarily a matter of federal constitutional, not state, law. Similarly, as the Supreme Court has said of 42 U.S.C. § 1983:

> It is abundantly clear that *one* reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced *and* the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies.

*Monroe v. Pape*, 365 U.S. 167, 180, 81 S.Ct. 473, 480, 5 L.Ed.2d 492 (1961) (emphasis added), *overruled in part on other grounds, Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). This statement summarizes the results of the Court's extensive review of the historical background of section 1983: federal courts are to afford a remedy only for such discriminatory enforcement of state laws as violates the independent guarantees of the fourteenth amendment.

A proper application of *Yick Wo* will not support the finding of an equal protection violation on the facts of this case. To the extent that the Supreme Court has addressed the point, it has confirmed the view that under *Yick Wo* state law does not define the equality or rationality guaranteed by the fourteenth amendment. *See Snowden v. Hughes*, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944). The selective prosecution cases, such as *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962), and its progeny, also make plain that per se analysis is impoverished.

In *Snowden* the Court addressed an equal protection claim by a candidate for the Illinois state legislature. The candidate received sufficient votes· in the primary to be nominated and placed on the ballot, but was unable to get on the ballot because the State Primary Canvassing Board intentionally refused to certify his election. The reasons for the board's refusal did not surface in the opinion, but the Court assumed that the Board had violated Illinois law by denying certification.

The Court found a number of flaws with the plaintiff's equal protection argument. The claim suffered from the same problem as that in the case at bar: although there was a showing that state law was violated, there was *no* showing that the violation also offended the federal equal protection clause. That is, the Court made clear that the rationality of the Board's decision was unaffected by the state legislature's prohibition of that decision. Since the legislature could constitutionally have written a statute that would have denied the plaintiff his nomination, the Board's decision to do

so in violation of state law was necessarily also constitutional. Justice Stone wrote:

[T]he action of the Board is ... subject to constitutional infirmity to the same but no greater extent than if the action were taken by the state legislature. Its illegality under the state statute can neither add to nor subtract from its constitutional validity. Mere violation of a state statute does not infringe the federal Constitution.... And state action, even though illegal under state law, can be no more and no less constitutional under the Fourteenth Amendment than if it were sanctioned by the state legislature. *Nashville, C. & St. L. Ry. v. Browning*, 310 U.S. 362, 369–70 [60 S.Ct. 968, 972, 84 L.Ed. 1254 (1940)]. *See also Coulter v. Louisville & Nashville R. Co.*, [196 U.S. 599], 608–9 [25 S.Ct. 342, 344, 49 L.Ed. 615 (1905)]; *Hayman v. Galveston*, 273 U.S. 414, 416 [47 S.Ct. 363, 364, 71 L.Ed. 714]; *Iowa-Des Moines Bank v. Bennett*, 284 U.S. 239, 244 [52 S.Ct. 133, 135, 76 L.Ed. 265]. A state statute which provided that one nominee rather than two should be certified in a particular election district would not be unconstitutional on its face and would be open to attack only if it were shown, as it is not here, that the exclusion of one and the election of another were invidious and purposely discriminatory. Compare *Missouri v. Lewis*, [11 Otto 22, 30, 32, 101 U.S. 22, 30, 32, 25 L.Ed. 989]; *Yick Wo v. Hopkins, supra.*

321 U.S. at 11, 64 S.Ct. at 402.

That *Yick Wo*'s guarantee of equality in administration of the laws turns on *federal* rather than state standards is also made plain in the Court's rules on selective prosecution, the quintessential *Yick Wo* problem. In *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962), for example, the Court denied the equal protection claim of a West Virginia prisoner who was sentenced to life imprisonment under the state's three-time felony offender statute. The prisoner complained that the state had selectively enforced the statute against himself and other prisoners, but the Court explained that because *federal* standards of equality were not shown to have been violated in the discriminatory enforcement, no equal protection claim was stated:

Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. Therefore grounds supporting a finding of a denial of equal protection were not alleged.... *Cf. Snowden v. Hughes*, 321 U.S. 1 [64 S.Ct. 397, 88 L.Ed. 497] (1944); *Yick Wo v. Hopkins*, 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220] (1886) (by implication).

*Id.* at 456, 82 S.Ct. at 505. The Court reaffirmed the same rule just this past term when it rejected the equal protection claim of a young man who refused to register for the draft and who was singled out for prosecution after he wrote letters to government officials stating that he would not register. *See Wayte v. United States*, — U.S. —, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). Our own court recently followed the principle as well, rejecting the selective prosecution claims of striking air traffic controllers who failed to demonstrate that the government's decision to prosecute them was discriminatory enforcement that was "invidious or in bad faith in that it rest[ed] on such impermissible considerations as race, religion, or the desire to prevent [the] exercise of constitutional rights." *United States v. Hoover*, 727 F.2d 387, 389 (5th Cir.1984) (quoting *United States v. Greene*, 697 F.2d 1229, 1234 (5th Cir.), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983)).

Both *Snowden* and the selective prosecution cases make plain that *Yick Wo* did not make state law the determinant of what classifications may be drawn under the fourteenth amendment. Simply and correctly recognizing that unconstitutional classes may be created in the administration of ostensibly neutral laws, *Yick Wo* forbids such classifications.

■ The panel also cited several cases in which federal *procedural* requirements

were tied to state-created substantive rights. *Compare* 755 F.2d at 433–34 & nn. 12–13, *and id.* at 434–35 (Clark, C.J., concurring) *with id.* at 438 & n. 8 (Goldberg, J., dissenting). It is of course quite true that, in our federal system, most property rights are created by state law. It has inexorably followed that the fourteenth amendment's due process clause operates to protect state-created property rights. The constitutional procedural standards of the due process clause are, however, wholly and exclusively federal in nature: a violation of state law is neither a necessary nor a sufficient condition for a finding of a due process violation. Indeed, as Judge Goldberg pointed out in dissent, *id.* at 438 n. 8, none of the Supreme Court cases cited by the panel majority involved any violation of state law at all. It does not and cannot follow from these due process decisions that every apparent transgression of state law by a state agency triggers the operation of the federal equal protection clause.

–3–

Whatever seeming logical force there might be to the argument that it is necessarily "irrational" and "arbitrary," in the federal constitutional sense, for a state agency intentionally to violate state law, that force quickly dissipates when the implications of the argument are considered. If state law defines who is entitled to what treatment or which means to a chosen goal are rational, then all intentional violations of state law by state agencies would violate the fourteenth amendment: if the action were taken against a class it would offend equal protection under the panel's per se construct, and if taken against an individual it would offend due process as defined by Chief Judge Clark.

One example of how the per se approach would transmogrify state law questions into constitutional claims springs readily to

mind. In those jurisdictions that have adopted a state "equal rights amendment," ratification of the proposed federal ERA would be virtually superfluous because violations of the state ERA would simultaneously violate the fourteenth amendment. Furthermore, *federal* courts would suddenly assume responsibility for determining the meaning of the state ERA's and would encounter many of the *Erie* difficulties that have bedeviled our exercise of diversity jurisdiction. Whenever a federal court determined that a person acting under color of state law had run afoul of one of these typically broad and vague state laws, it would conclude that "a state agency's discriminatory action when state law commands equality is a patent denial of equal protection to those denied equality." 755 F.2d at 432.[2]

The principle that federal constitutional protection is independent of state law is nothing new. In habeas review, we limit the issuance of the writ to those cases where there have been federal constitutional violations; we do not review all possible errors of state law. In *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), for example, a prisoner under sentence of death was denied federal review of his claim that he had been denied the "comparative proportionality review" due him under state law: "A federal court may not issue the [habeas] writ on the basis of a perceived error of state law." *Id.* 104 S.Ct. at 874–75. It would not be easy to explain why the Constitution requires federal supervision of the enforcement of state law for the benefit of those who wish to practice osteopathy but not for the protection of those facing execution at the hands of the state.

Our system of shared government power requires all the deference traditionally given in rational-basis review. Our lodestar is not what the state legislature has done or

**2.** In the case at bar, which involved a fairly precise state prohibition against differentiating in medical staff appointments "solely on the basis of the academic medical degree held by" a licensed physician, the district court had to engage in a complex and extended analysis in

order to determine whether the state law had been violated. See 565 F.Supp. at 1445–52. In cases where state law is less clear, federal courts would face correspondingly greater difficulties and would to that extent be more prone to error.

purported to do, but what *any* rational decisionmaker might have chosen to do. We may not be "lost in a maze if we put that compass by," but we certainly will be trespassing on state domains. State law is in no way demeaned or trivialized by its present status as state, rather than federal, law. The federal judiciary, for its part, has enough federal law to enforce without annexing new bodies of state legislation. We must, and will, leave violations of state law to be corrected by the appropriate state mechanisms.

## IV

▉▉ Having rejected the panel's per se analysis, we undertake a review of the district court's judgment. Because the district court found differences between allopaths and osteopaths that are in our view sufficient to permit Texas or its agencies to differentiate in the granting of hospital staff privileges, that court's conclusion of unconstitutionality cannot stand.

▉▉▉ In the trial of constitutional issues, the differing roles of historical and legislative facts can present conceptual difficulties. We need not in this case attempt to distinguish precisely between historical and legislative facts in the district court's findings: however the findings be characterized, the state action in question was constitutional. The general distinction between legislative and adjudicative facts is nevertheless important because it helps to show why the district court ought to have asked only whether there was any conceivable basis for the Tarrant County Hospital District's implicit legislative judgment regarding the import of the differences between the two medical training programs. A factual conclusion by the district court, based on conflicting evidence about an historical fact, would be binding in this court. But such a factual conclusion could *not* be used to displace a legislative judgment and therefore could not be a sufficient basis for declaring the Hospital District's action unconstitutional.

After a bench trial, the district court found that the Hospital District's different treatment of allopaths and osteopaths was "not a requirement which has as a foundation a reasonable basis such as professional and ethical qualifications for the common good of the public or the hospital itself", 565 F.Supp. at 1454, and concluded that the facts today are different from those existing at the time of *Hayman v. City of Galveston,* 273 U.S. 414, 47 S.Ct. 363, 71 L.Ed. 714 (1927), *see* 565 F.Supp. at 1443. It is conceded that the facts allow only the conclusion that allopathic and osteopathic training programs have similar course requirements and content, and that graduates face identical testing and licensing requirements. We find no fault with the district court opinion in this respect and we approve that court's decision to use the rational-relationship standard of review. We also agree that the Texas Medical Practice Act is relevant to, though not dispositive of, the question of whether there was a rational basis for differentiation.

The difficulty is that the district court also concluded that "[t]he only remaining difference between D.O.'s and M.D.'s has been described simply as one of philosophy." 565 F.Supp. at 1443. Our question is whether the legislature *could* have sanctioned the classification drawn by the Tarrant County Hospital District without denying osteopaths equal protection. If the distinct medical approaches adopted by allopaths and osteopaths provide a sufficient basis for such a classification, our inquiry ends. *Cf. Home Depot, Inc. v. Guste,* 773 F.2d 616 (5th Cir.1985).

In *Maceluch v. Wysong,* 680 F.2d 1062 (5th Cir.1982), we concluded that the differences between the allopathic and osteopathic schools in their approach to medical treatment justified the state's requirement that osteopaths identify themselves to medical consumers with the "D.O." label. We adopted the opinion of the district court, which explained:

> Despite the fact that medicine is practiced within an objective scientific framework, the decisional processes of a physician reflect not only the aggregate of a substantive knowledge of clinical tech-

niques, but also his judgments as to the need for, and nature of, treatment. That skill, born of experience, perception of human nature, and intuitions as to what is best for a patient, jumps over the many voids in "scientific" knowledge and separates the scientist from the doctor. It follows that two schools of medicine that advocate differing approaches, even if they differ only in their advocacy of differing philosophical approaches to the same scientific realities, present a difference that a legislature may note without unlawfully discriminating against one, or preferring one over the other.

. . . .

In sum, the state has demonstrated a rational relationship between its licensing categories and debatable, if not real, differences between doctors possessing M.D. and D.O. degrees. That is all that the Constitution requires.

*Id.* at 1066–68 (citation omitted).

■■■ The reasons underlying our decision in *Maceluch* also apply to the case at bar. We held that it was rational for the state to take steps to ensure that medical consumers could distinguish easily between allopaths and osteopaths. It is no less rational for a state, in the exercise of its police power, to make the same choice that *Maceluch* permitted it to give to its citizens. Nor does this choice become less rational when it is made by a state agency, such as the Tarrant County Hospital District. "[T]hose challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 723, 66 L.Ed.2d 659 (1981) (quoting *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979)). The legislative facts involved in this case, as in *Maceluch,* are conceivably, if not indubitably, true.

The judgment of the district court is accordingly REVERSED.

1. U.S. Const. art. VI, cl. 2.

ALVIN B. RUBIN, Circuit Judge, with whom CLARK, Chief Judge, POLITZ, TATE, and JOHNSON, Circuit Judges, join dissenting:

The majority opinion refuses to prevent a state agency from discriminating against osteopathic physicians in favor of allopathic physicians in defiance of state law. In so doing, it disregards both the plain language of the fourteenth amendment and the historic reasons for its enactment, for the equal protection clause forbids, and was intended to forbid, a state to purposefully and arbitrarily deny to one class of persons the protection of a state law that it affords to another class of persons.

The majority, in addition, accords to the conclusions of a board of directors of a hospital district the same deference it extends to the enactments of a state legislature. It attaches the same presumptive validity to the decisions of every state agency, however petty or limited in its jurisdiction, that is extended to formal enactments of state statutes. In so reasoning, the majority disregards findings of fact directly contrary to the conclusion it reaches and fails to heed the mandate of rule 52(a) of the Federal Rules of Civil Procedure, adroitly sidestepping the rule's applicability by labeling the facts on review as "legislative" rather than "adjudicative." I must, therefore, respectfully dissent.

I.

The fourteenth amendment forbids any state to "deny to any person within its jurisdiction the equal protection of the laws." The amendment was not needed to ensure that the states provide equal protection of federal laws, for the text of the original Constitution makes federal law the supreme law of the land, "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." [1] The equal protection clause was needed and was intended to assure that the states afford to all persons the equal protection of their

own laws. The Supreme Court certainly takes this view, for in *Monroe v. Pape*, it said of section 1983:

> It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, *state laws might not be enforced* and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies.[2]

The majority seizes upon the single word "and" in this passage from *Monroe* and then asserts that federal equal protection is denied only when a state's failure to enforce its laws also constitutes a denial of a right, privilege or immunity secured by the Constitution. This is an unwarranted and unprecedented reading. The fourteenth amendment forbids the states *either* to "make or enforce any law which shall abridge the privileges or immunities of citizens of the United States" *or* to "deprive any person of life, liberty, or property, without due process of law" *or* "to deny to any person within its jurisdiction the equal protection of the laws." The sentence from *Monroe v. Pape* was not intended to limit the shield of the civil rights legislation to state action that denies *both* equal protection and citizenship privileges and immunities. Indeed, as that opinion continues, "It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy...."[3]

"It was not the unavailability of state remedies *but the failure of certain states to enforce the laws with an equal hand* that furnished the powerful momentum behind the 'force bill,'" *Monroe v. Pape*[4]

continues. "While one main source of the evil—perhaps the leading one—was the Ku Klux Klan," the Court states, "the remedy created was not a remedy against it or its members but against *those who representing a state in some capacity were unable or unwilling to enforce a state law....* There was, it was said, no quarrel with the state laws on the books. It was their lack of enforcement that was the nub of the difficulty."[5] As Senator Howard, one of the sponsors of the amendment, stated, the purpose of the equal protection clause was to prohibit the states from

> denying to [any person] the equal protection of the laws *of the State.* This [clause] abolishes all class legislation in the States and does away with the injustice of subjecting one caste of persons to a code not applicable to another.[6]

Before adoption of the fourteenth amendment, the states were not required by the Constitution to provide either due process or equal protection. The Bill of Rights, Chief Justice Marshall wrote in 1833, was "intended solely as a limitation on the exercise of power by the government of the United States, and is not applicable to the legislation of the states."[7] The thirteenth amendment, which prohibited involuntary servitude, had been adopted in 1868. Some states responded by enacting laws that discriminated, either explicitly or implicitly, against the former slaves, for example, by the use of grandfather clauses. Many states also enforced apparently neutral laws in a discriminatory manner: crimes that were explicitly forbidden by state law were condoned when committed by whites against blacks.

To combat both kinds of discrimination, Congress enacted, over the veto of President Andrew Johnson, the first civil rights

---

**2.** 365 U.S. 167, 180, 81 S.Ct. 473, 480, 5 L.Ed.2d 492, 500 (1961) (emphasis added).

**3.** *Id.* at 183, 81 S.Ct. at 482, 5 L.Ed.2d at 503.

**4.** 365 U.S. 167, 174–75, 81 S.Ct. 473, 477, 5 L.Ed.2d 492, 498 (1961) (emphasis added).

**5.** *Id.* at 176, 81 S.Ct. at 478, 5 L.Ed.2d at 499 (added in original).

**6.** 6 C. Fairman, *History of the Supreme Court of the United States—Reconstruction and Reunion 1864–88,* at 1925 (1971) (emphasis added).

**7.** *Barron v. Mayor and City Council of Baltimore,* 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833).

laws. There was doubt, however, whether Congress had the power to adopt these laws, and President Johnson had given the unconstitutionality of the legislation[8] as one reason for his veto. "Immediately pressing to [the fourteenth amendment] sponsors was the desire to provide a firm constitutional basis for the already enacted civil rights legislation."[9] Congress sought, in addition, to amend "the Constitution to place repeal beyond the accomplishment of a simple majority in a future Congress."[10]

While a major purpose of the equal protection clause was to prevent discrimination against blacks, it was not, as we know, confined to requiring equal treatment of the races for it assures equal protection of the laws to all "persons." Thus, the purpose of the equal protection clause of the fourteenth amendment was to forbid both kinds of unequal state action: the enactment of discriminatory laws and the discriminatory administration or enforcement of laws that were not themselves discriminatory.

The jurisprudence, however, has been concerned almost entirely with discriminatory laws, that is, with determining whether laws that are nondiscriminatory on their face are discriminatory in fact and whether classifications expressly drawn by state laws are constitutional. These cases continue to be considered writ-worthy by the Court.

The fact that the legal contest has been concentrated in this area should not, however, cause us to neglect consideration of the amendment's plain, but "majestically unconfined,"[11] language. In 1880, when the history and purpose of the fourteenth amendment were known to every justice,

the Supreme Court interpreted the equal protection clause to prohibit discriminatory application of state law by a judge who excluded blacks from a jury because, in part, this was "outside his authority and in direct violation of the spirit of the *State statute.* That statute gave him no authority, when selecting jurors ... to exclude all colored men merely because they were colored. Such an exclusion was not left within the limits of his discretion."[12]

While that case involved the criminal portions of the Civil Rights Acts and racial discrimination, its rationale was not based on the later-developed differential scrutiny theory but on the simple thesis that it was a denial of equal protection for a state agent to discriminate against a class of people in violation of state law. Similarly, in dicta, a circuit court sitting in Alabama in 1871 said in *United States v. Hall:*[13]

> [T]he fourteenth amendment not only prohibits the making or enforcing of laws which shall abridge the privileges of the citizen, but prohibits the states from denying to all persons within its jurisdiction the equal protection of the laws. Denying includes inaction as well as action, and denying the equal protection of the laws includes the omission to protect, as well as the omission to pass laws for protection.

A state official who intentionally treats two classes of people differently in the face of a valid state law that implies equal treatment violates the equal protection guarantee. A century ago in *Yick Wo v. Hopkins,*[14] the Court held unconstitutional the administration of a municipal ordinance that denied "a particular class of persons," Chinese laundry owners, permits that were

---

**8.** *See Schnapper, Affirmative Action and the Legislative History of the Fourteenth Amendment,* 71 Va.L.Rev. 753, 785–86 (1985).

**9.** Congressional Research Service, Library of Congress, *The Constitution of the United States of America—Analysis and Interpretation* 1470 (1973).

**10.** *Id.*

**11.** Congressional Research Service, *supra* note 5, at 1471.

**12.** *Ex Parte* Virginia, 10 Otto 339, 100 U.S. 339, 348, 25 L.Ed. 676 (1880) (emphasis added).

**13.** 26 F.Cas. 79, 81 (C.C.S.D.Ala.1871) (No. 15,-282).

**14.** 118 U.S. 356, 374, 6 S.Ct. 1064, 1073, 30 L.Ed.2d 220, 228 (1886).

granted to others who were not Chinese. The case presented here involves an even more egregious denial of equal protection—intentional discrimination in defiance of a state law that exacts, not merely implies, equal treatment. The majority opinion agrees that Texas law requires two classes of persons, doctors holding the M.D. degree and doctors holding the D.O. degree, to be treated alike. The majority opinion agrees that the Tarrant County Hospital District has violated that law and, at least inferentially, accepts the conclusion that this discrimination between the two classes of persons is purposeful. This, I submit, is enough to make the Hospital District's action a denial of equal protection.

The majority opinion relies upon a lengthy quotation from *Snowden v. Hughes*.[15] But it fails to include another statement of the *Snowden* court that directly conflicts with the rationale the majority opinion espouses. At the outset of its discussion of the equal protection clause in *Snowden,* the Supreme Court said:

> The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection *unless there is shown to be present in it an element of intentional or purposeful discrimination.*[16]

"This [discrimination] may appear on the face of the action taken with respect to a particular class or person," the Court continued, "or it may only be shown by extrinsic evidence showing a discriminatory design to favor one individual or class over another not to be inferred from the action itself...."[17] Snowden himself did not qualify for the equal protection guarantee because he did not even allege "a purposeful discrimination between persons or classes of persons."[18] "So far as appears the [Illinois State] Board's failure to certify petitioner was unaffected by and unrelated to the certification of any other nominee,"[19] the Court said. Absent such purposeful discrimination between classes of persons, the Illinois State Board's action was not a denial of equal protection of the law.

The majority's reliance on the opinion in *Oyler v. Boles,*[20] a discriminatory prosecution case, is no more justified. As the majority's quotation notes, and disregards, the Supreme Court there held that selective law enforcement "is not in itself a federal constitutional violation" unless "the selection was deliberately based upon an unjustifiable standard such as [but, I suggest, not limited to] race, religion, or other arbitrary classification."[21]

The scope and applicability of the equal protection clause are, of course, determined by federal standards. The validity of the Texas statute being unchallenged, discrimination in its administration violates the federal constitution.

## II.

The majority opinion starts with a bland statement of law: rational state action does not violate the equal protection clause simply because it violates a state anti-discrimination statute. The action of the Tarrant County Hospital District is not so innocuous. Stating the rule in this fashion begs the questions put by this case: whether there is in fact a rational basis for the state action and whether a subordinate state agency acts rationally when it defies state law and discriminates against one class of persons while favoring another.

The state or a state agency may, without denying equal protection, make a distinc-

---

**15.** 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944).

**16.** *Id.* at 8, 64 S.Ct. at 401, 88 L.Ed. at 502 (emphasis added).

**17.** *Id.,* 64 S.Ct. at 401, 88 L.Ed. at 502 (citations omitted).

**18.** *Id.* at 10, 64 S.Ct. at 402, 88 L.Ed. at 504.

**19.** *Id.,* 64 S.Ct. at 402, 88 L.Ed. at 504.

**20.** 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962).

**21.** *Id.* at 456, 82 S.Ct. at 506, 7 L.Ed.2d at 453.

tion between two classes of persons if the purpose of making the distinction is lawful and the distinction is rationally related to a legitimate state purpose. Once, however, the state adopts a statute affirmatively requiring that two classes of persons be treated alike, a state agency may not decree either lawfully or rationally that, despite what the legislature says, it is still going to discriminate. I suggest that it is *per se* not only unlawful, but arbitrary and capricious, hence not rational, for a state agency intentionally to create a discriminatory classification forbidden by a valid state law.

The state did not grant Tarrant County Hospital District any discretion to consider, with respect to a physician's qualifications, the nature of the physician's medical degree, allopathic or osteopathic. This case, therefore, presents a situation distinguishable from that typically found in "selective enforcement" cases. In such cases, state law often accords state agencies, such as zoning or liquor licensing boards, a great deal of discretion. This case is different. To prevail on equal protection grounds, the plaintiff here need only show that (1) he is a member of a class of persons who have been discriminated against on the basis of their membership in that class; (2) members of other classes, otherwise similarly situated, have been treated differently; and (3) the discriminatory treatment was purposeful.

The actions of the Tarrant County Hospital District were patently discriminatory and were taken in violation of a state statute that denied it any discretion. Its actions obviously did not further what the state legislature had determined to be a legitimate state purpose. The District purposefully denied to osteopaths the protection of the law it granted to allopaths.[22] In so doing it denied plaintiffs the equal protection of state law, and this in turn consti-

tuted a violation of the constitutional guarantee of equal protection.

The majority concedes the "seeming logical force"[23] of this analysis by what first year law students will recognize as the slippery slope argument: to accept the thesis might lead to dread consequences. Violation of a state equal rights amendment might be a federal constitutional violation. That contention, however, portends no disaster. Purposeful discrimination *by a state agency* against a class of persons in order to favor another class in deliberate disregard of a valid state law—even (or perhaps especially) an equal rights law—constitutes a denial of equal protection.

The action of the Tarrant County Hospital District was not merely a violation of state law that might be remedied in the state courts. It was also a violation of the Constitution. A federal court, district or appellate, cannot ignore its duty simply because an alleged constitutional violation may also be contrary to state law or because the constitutional claim may require the court "to engage in a complex and extended analysis"[24] of a "typically broad and vague state law."[25]

### III.

The majority opinion rests on the premise that the Hospital District acted rationally in pursuit of a legitimate state purpose. Rationality, however, is not a purely subjective judgment. "Rational" means "based on reason." Reason rests on facts. The action of the Hospital District was, as the district court found, unreasonable. Based on testimony adduced before it, not merely on conjecture as to possible reasons for the District's action, the court concluded that, for purposes of admission to practice in the hospital, no significant differences existed between the post-graduate training of allopaths and osteopaths.

As the majority opinion notes, the district court found that the Hospital District's dif-

**22.** *Cf. Ex Parte* Virginia, 10 Otto 676, 100 U.S. 339, 348, 25 L.Ed. 676 (1880).

**23.** Majority opinion, p. 1059.

**24.** Majority opinion, p. 1059 n. 2.

**25.** Majority opinion, p. 1059.

ferent treatment of allopaths and osteopaths was not founded on a "reasonable basis such as professional and ethical qualifications for the common good of the public or the hospital itself." [26] "It is conceded," the majority states, "that the facts allow only the conclusion that allopathic and osteopathic training programs have similar course requirements and content, and that graduates face identical testing and licensing requirements." [27] And it adds, "[w]e find no fault with the district court opinion in this respect." [28] Nevertheless, the majority opinion ignores all of these facts on the basis that, if the legislature might validly have discriminated against osteopaths, the Hospital District may do so—without regard to the facts.

The majority opinion does not even mention Fed.R.Civ.P. 52(a), which requires that the facts found by a district court are to be accepted on appeal unless clearly erroneous. Whether there is a rational basis for treating differently two classes of persons must, I submit, turn on the facts distinguishing these classes as shown by the evidence. The majority seeks to justify its disregard of the evidence and the fact findings by asserting that the validity of the discrimination against osteopaths is to be determined by something called "legislative" facts rather than "adjudicative" or historical facts. But "legislative" facts, it turns out, are not facts at all. They are, in this instance, assumptions utilized to uphold the state agency's disregard of the facts. District courts are apparently not to take evidence when the actions of inferior state agencies are challenged, but are instead only to determine whether there is "any *conceivable* basis for the [agency's] implicit legislative judgment." [29] The agency's mind having been made up, neither the agency nor the court is to be confused by the facts, and the court is to evaluate only the agency lawyer's post-hoc suggestion of a conceivable basis that might have been in the agency's mind—even if it was not.

Even when factual findings are of constitutional importance and an appellate court is not bound by rule 52(a), the appellate court undertakes to review the facts independently. The Supreme Court and this court do not hypothesize but determine the facts from the evidence.[30]

We have repeatedly rejected the suggestion that the actions of a federal administrative agency might be validated on the basis of rationalizations developed by counsel.[31] While we presume valid and accord deference to determinations made by state legislatures,[32] we do so at least in part because the legislature is the highest state law-making agency, elected by a democratic process, enacts statutes in a deliberative manner, and its enactments become law only if approved by the state's highest executive or reenacted by a substantial majority over his veto. In *New Orleans v. Dukes*,[33] this deference was extended to a municipal ordinance, adopted in legislative fashion, in which the city's objective in enacting the ordinance was clearly identified. But as Justice Powell said in dissenting from the Court's opinion in *Schweiker v. Wilson*,[34] "The deference to which legis-

---

**26.** *Stern v. Tarrant County Hosp. Dist.*, 565 F.Supp. 1440, 1454.

**27.** Majority opinion, p. 1060.

**28.** Majority opinion, p. 1060.

**29.** Majority opinion, p. 1060.

**30.** *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *Jones v. Diamond*, 636 F.2d 1364, 1370 & n. 7 (5th Cir.1981); *see also Cousins v. City Council*, 466 F.2d 830, 837 (7th Cir.), *cert. denied*, 409 U.S. 893, 93 S.Ct. 85, 34 L.Ed.2d 151 (1972).

**31.** *See, e.g., United States v. New Orleans Public Service*, 723 F.2d 422, 428–29 (5th Cir.1984).

**32.** *See, e.g., Home Depot, Inc. v. Guste*, 773 F.2d 616 (1985).

**33.** 427 U.S. 297, 304, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511, 517 (1976).

**34.** 450 U.S. 221, 243, 101 S.Ct. 1074, 1087, 67 L.Ed.2d 186, 203 (1981); *cf. Regents of the University of California v. Bakke*, 438 U.S. 265, 309, 98 S.Ct. 2733, 2758, 57 L.Ed.2d 750, 783 (1978); *see also Kramer v. Union Free School Dist., No. 15*, 395 U.S. 621, 639, 89 S.Ct. 1886, 1895–96, 23 L.Ed.2d 583, 596 (1969) (Steward, J. dissenting).

lative accommodation of conflicting interests is entitled rests in part upon the principle that the political process of our majoritarian democracy responds to the wishes of the people." No similar deliberations are exacted of appointed state agencies and no similar deferential presumption of constitutionality attends their actions. Deference of this extreme sort is hardly due to the decision of a hospital board, a majority of whose members are allopathic physicians, made without hearings or evidence, to exclude osteopathic physicians. Instead, it seems to me, we should view such self-serving decisions with at least some measure of skepticism.

Justice Powell has said, "when a legislative purpose can be suggested only by the ingenuity of a government lawyer litigating the constitutionality of a statute, a reviewing court may be presented not so much with a legislative policy as its absence." [35] Moreover, at least one fact that is undoubtedly legislative cannot be ignored: The Texas state legislature has declared unlawful what its creature, the Tarrant County Hospital District, has chosen to do. Even if this is not decisive, it is a fact that must be considered in determining both the rationality of the District's actions and whether its actions are to be accorded the deference given a state legislature's deliberate enactments.

The majority opinion puts the Constitution at the mercy of every petty state agency if only its lawyers can submit a thesis, unsupported by factual evidence, that *might* support constitutionality. The opinion cannot be supported by the Supreme Court decision in *Hayman v. City of Galveston,*[36] for evidence of the kind here presented was not in the record before that Court.

The opinion in *Hayman,* moreover, rested at least in part on the conclusion that the action of the Galveston Hospital Board in discriminating against osteopaths did not violate the Texas constitutional provision that forbids any preference to "be given by law to any schools of medicine." [37] The Court found that the state constitutional limitation was directed only to the qualifications of those to be admitted to medical practice in the state and did not limit consideration of medical practitioners' qualifications to practice in a state hospital.[38]

Since *Hayman* significant changes have occurred in the education, training, and licensing of osteopaths and in Texas law. That state action was not arbitrary under facts existing a half century ago does not make it rational today. The decision of a panel of this court in *Berman v. Florida Medical Center, Inc.*[39] is no more confining, for that case dealt with a private hospital and did not involve state action.

### IV.

The fourteenth amendment forbids the state and its agencies to discriminate against any class of persons. It is a bulwark against prejudice, against state action that condemns without rational basis. The clause was adopted to assure not only that states enact nondiscriminatory laws but also that they administer state law equally and fairly. The majority opinion refuses to apply the literal mandate of the Constitution and ignores the history that led to its enactment. It condones the bigotry of an allopathic-dominated state hospital district that refuses to be bothered by either the state law, the federal constitution, or the facts.

**35.** *Schweiker v. Wilson,* 450 U.S. 221, 243, 101 S.Ct. 1074, 1087, 67 L.Ed.2d 186, 203 (1981).

**36.** 273 U.S. 414, 47 S.Ct. 363, 71 L.Ed. 714 (1927).

**37.** Tex. Const. art. 16 § 31.

**38.** 273 U.S. at 418, 47 S.Ct. at 364, 71 L.Ed. at 417.

**39.** 600 F.2d 466 (5th Cir.1979).